## J. D. Polk v. Beaumont Pasture Company of 1887 et al.

### Decided May 21, 1901.

**1.—Adverse Possession—Limitation—Conflict of Surveys.**

Where there is a conflict of surveys the statute of limitations will not run in favor of an adverse occupant under the junior title unless his actual possession extends to that part of the land within the conflict, since, until an actual ouster, the constructive possession of the holder of the senior title is not disturbed. Following the ruling in this case on former appeal. Pasture Co. v. Polk, 55 S. W. Rep., 614.

**2.—Same—Inclosure by Natural Barriers.**

Where an inclosure of land is relied on to show adverse possession, such inclosure may be made partly by the use of natural barriers, but in such case the natural barriers must be so used in connection with artificial barriers as to indicate that they are relied on to inclose the land and to keep out persons desiring access thereto.

**3.—Same—Large Pasture.**

The inclosure of a pasture of 48,000 acres in part by a fence, and in larger part by the use of natural barriers, such as bayous, a lake, a river and a marsh constituting five-sixths of the entire barriers, does not constitute such visible appropriation and adverse possession of the land as will support litigation, since such natural barriers are not of a character to indicate to all persons that they are relied on as barriers to inclose the land.

Appeal from Jefferson. Tried below before Hon. Stephen P. West.

*O'Brien, Bordages & O'Brien* and *George C. Greer,* for appellant.

*Greer & Greer,* for appellees.

PLEASANTS, Associate Justice.—This is an action of trespass to try title brought by the appellant against the appellees to recover the title and possession of a tract of 587½ acres of land, a part of the W. W. Carroll league, in Jefferson County. The original petition was filed on April 28, 1897, and alleged an ouster by the defendants on January 1, 1897. By amendment filed June 30, 1899, plaintiff, after repleading all of the facts set up in his original petition, by a second count alleged that if he should be mistaken in his allegation that he owned all of the land in controversy on the 1st day of January, 1897, that he had title to all of said land on the 30th day of June, 1899, and on said last named date defendants unlawfully entered upon said land and ejected plaintiff therefrom. Defendants answered by general denial, pleas of not guilty, and of the three, five, and ten years statutes of limitation.

The trial of the cause in the court below resulted in a verdict and judgment in favor of defendants, from which judgment this appeal is prosecuted.

Appellant holds the superior record title to the land in controversy, and is entitled to recover same unless such right is defeated by the statute of limitation. Succinctly stated, the facts disclosed by the record are as follows: The W. W. Carroll league, of which the land in controversy is

a part, was granted to said Carroll on the 15th day of June, 1835. On July 29, 1835, Carroll conveyed said league to John A. Veatch, and Veatch conveyed the land in controversy to John W. Dougherty on April 20, 1840. This deed was filed for record in Jefferson County on November 9, 1846. Appellant, by regular chain of mesne conveyances, is the holder of the Dougherty title. On January 20, 1846, John A. Veatch conveyed the whole of the W. W. Carroll league to Mahala L. Sharp. This deed recites a consideration of $1000, and was filed for record in Jefferson County on the 17th day of October, 1846. Appellees, by regular chain of mesne conveyances, are the holders of the Sharp title. There is no evidence, other than the recital in the deed, that Mahala Sharp paid any consideration for the land, nor any evidence that the said Sharp did not have notice at the time said deed was executed that Veatch had previously conveyed the land in controversy to Dougherty. The inclosure upon which appellees rely to support their claim of adverse possession of the land was completed in September, 1878, and the fences then constructed have been kept up from that time to the time of the trial in the court below. This inclosure was formed by a fence commencing at the edge of the marsh on the south side of the Neches River and running in a southwestern direction about 2½ miles, and thence south about 6 miles to Rodair Bayou. This fence was the only artificial barrier inclosing the pasture in which the land in controversy was situated. The remaining boundaries of said pasture were as follows: Down Rodair's Bayou to Taylor's Bayou; thence southeasterly along Taylor's Bayou to Sabine Lake; thence northwesterly along the edge of the lake to the mouth of the Neches River; thence up the Neches River to a point opposite the beginning point of the fence before described; thence across the marsh a distance of 1½ or 2 miles to the beginning. The length of the natural barriers inclosing this pasture was between 45 and 50 miles, while the artificial barriers, as before stated, were not more than 8½ miles in length. These natural barriers were sufficient to prevent the passage of stock into and out of said pasture. The marsh between the end of the fence and the Neches River is an impassable bog.

There were inside of the so-called inclosure, in 1878, when first made, about seventeen or eighteen families, nearly all of whom owned tracts of land of their own, independently of the Beaumont Pasture Company, their holdings varying from seventy-five to several hundred acres. Most of them had little herds of cattle, varying in size from fifteen to fifty or sixty head. The company told most of the holders when putting up the fence on the west and northwest, in 1878, that they did not intend to disturb them. Further than this there was no agreement or common purpose. On this subject the defendant McFaddin testified as follows:

"When we (meaning defendants) got ready to build that pasture, we went to everyone in there, and we agreed to leave what stock they had in there with them. They were to pasture in there with us. They only had small bunches of cattle and horses. We agreed they should keep

whatever they had in there, whether they had land or not. The people
that did not live in there we were going to turn their horses and cattle
out, and we wanted to be neighborly with them. We would let them
(people living in the pasture) graze their cattle in there, and not pay
any pro rata of the fencing, and we were to put in all our cattle to
graze in common; we were to graze cattle together."

Subsequent to the original construction, persons, strangers to the
company, bought land, moved in, and others inside sold out to inde-
pendent parties, no kind of assurance or agreement being asked or given.
These persons moved in without any sort of consent or understanding,
and held their land and grazed their stock at will. The stock of the
fifteen or twenty independent families grazed at will; these independent
holders agreed to no terms or restrictions, and had nothing to do with
making or maintaining any inclosures except their own inclosures around
their separate tracts inside the large pasture. This inclosure embraced
about 50,000 acres of land. At the time the pasture was inclosed, in
1878, the defendants owned about 28,000 acres of the land inclosed, but
this holding was increased by purchase by defendants to about 48,000
acres in 1887. The tracts owned by independent occupants within said
inclosure were scattered over various portions thereof. There was a
community composed of about fifteen families near Grigsby's Bluff, in
said inclosure, where there was a postoffice and schoolhouse. A public
road leading from Beaumont to Sabine Pass ran through said inclosure,
entering by a gate near the north end of the Carroll survey and passing
through and out of the alleged pasture without crossing any barrier on
the south except Taylor's Bayou. The defendants own a pasture of
6000 acres on the north of the inclosure before described. This pasture
was built in 1884, and the fence forming the barrier on the northwest
side of the large inclosure forms the southern boundary of the 6000-
acre pasture. The road from Beaumont before mentioned traverses the
small pasture and it enters the large inclosure from the small one. There
was no actual occupation of the land in controversy until May 14, 1896,
at which time appellees placed a tenant thereon, and has continuously
occupied same by tenant up to June, 1899.

In 1878 the Beaumont Pasture Company constructed a house on the
northern end of the W. W. Carroll survey near the southeast corner of
the Johnson survey, and kept tenants continuously occupying said house
and cultivating a little inclosure of about ten acres on the W. W. Carroll
survey near the gate from 1878 up to the time of the sale by the pasture
company to the Port Arthur Land Company in 1895. There was also
another small inclosure on the northern portion of the Carroll survey,
but neither inclosure and none of the improvements made by the
company reached nearer than 1½ miles to the land in suit.

On the 15th day of October, 1895, the Beaumont Pasture Company
sold out all of its holdings except a few small tracts to the Port Arthur
Land Company, selling in all about 48,000 acres of land, there being
several thousand acres inside of said inclosure not included in the sale,

because the pasture company did not own the same. It belonged to various independent holders. The land in suit was not included in the sale, and the Port Arthur Land Company has never claimed it, but has owned and claimed the 48,000 acres purchased since the date of the purchase.

The defendant's deed to the Carroll league has been on record since 1878, and they have paid all taxes thereon continuously up to the sale

to the Port Arthur Company in 1895, and since that time have paid all taxes on the land in controversy. The above plat shows the several inclosures, the position therein of the land in controversy, and the relative positions and extent of the artificial and natural barriers forming said inclosure.

The appellees kept the gate leading into said large pasture closed, and

at all times asserted and exercised dominion over said inclosure to the extent of preventing persons not owning land therein from turning stock into said inclosures; and turning out all stock found in said pasture not belonging to some person owning land therein.

By proper assignments the appellant raises the question of the sufficiency of the evidence to sustain the verdict of the jury upon the issue of limitation.

If appellees had inclosed the entire pasture by artificial barriers, it may well be doubted whether the dominion and control shown by the evidence to have been exercised by them over said inclosure would be sufficient to establish such exclusive possession and control of said pasture as would render appellees possession of the land situated therein "adverse possession" as that term is used and defined in the statute.

But conceding, for the sake of argument, that the evidence is sufficient on this phase of the question, we are of opinion that it wholly fails to establish one of the essential elements of adverse possession, in that it fails to show a visible appropriation of the land. In discussing this question we shall first dispose of the contention of appellees, that possession by them under their deed to the Carroll league or any portion of said league was possession of the whole league, including the land in controversy.

This contention was made by appellees on a former appeal of this case and decided adversely to them. See Pasture Co. v. Polk, 55 S. W. Rep., 614. It has been uniformly held by our courts that where there is a conflict of surveys, the statute of limitation will not run in favor of an adverse occupant under the junior grant unless the actual possession of the claimant under said grant extends to that portion of the land within the conflict. In other words, the general rule that the possession of an occupant of land under a deed is coextensive with the boundaries described in the deed does not apply when such boundaries conflict with a senior survey, but in such case there must be actual possession of the land in conflict to support a title thereto by limitation in favor of the holder of the junior title. The principle upon which this doctrine rests is that the law gives to the holder of the senior title the constructive seizen and possession of the land described in his grant, and he retains such constructive possession until ousted by an actual possession in another claiming adversely. In the case of Turner v. Moore, 81 Texas, 206, this doctrine is applied to a state of facts similar to the facts in this case. In that case the owner of a league of land had subdivided it into several parts and conveyed two of said subdivisions to Moore. Turner, after the conveyance to Moore, obtained a deed to the whole of said league and went into possession of same and made improvements thereon. Moore never had actual possession of the subdivision owned by him, nor did the actual possession of Turner extend to or include said subdivision. In their opinion in that case the court say, that while there may be a technical difference between the conditions arising from these facts and a case in which there is a conflict between a senior and a

junior survey, they are logically the same, and the possession of the holder of the junior title should be likened to that of the occupant of land covered by a junior grant partly in conflict with a senior location. We think it clear that the rule announced in Turner v. Moore is applicable to the facts in this case, and that appellees' defense of limitation can not be sustained by proof of actual possession of any portion of the Carroll league other than the 587½ acres in controversy.

This brings us to a consideration of the question as to whether or not the facts in this case show such actual possession by the appellees of the 587½ acres of land in controversy as will support their plea of limitation. The adverse possession of land sufficient to support the statute of limitation must be actual and visible, and must indicate clearly an assertion of claim of ownership in the occupant. In order to obtain such possession, the occupant must inclose the land or a portion of it, or put such improvements thereon as will give notice to the owner of such adverse possession. Where an inclosure of the land is relied on to show such adverse possession, such inclosure may be made partly by the use of natural barriers, but in such case the natural barriers must be so used in connection with artificial barriers as to indicate that they are relied on to inclose the land and to keep out persons desiring access thereto. More than five-siixths of the barriers inclosing the large pasture in which the land in controversy in this suit is situated are natural barriers, consisting of bayous, lake, river, and marsh. The owner of the land crossing Sabine Lake from the southeast and entering said inclosure would find no barrier between said lake and the land in question, nor, if he followed the shore of said lake for its entire length, would he find any artificial barrier connecting with the lake which would indicate that said lake was relied on as a barrier to inclose his land. The same conditions would exist if he entered said pasture by crossing Taylor's Bayou or the Neches River. If he entered on the public road leading from Beaumont to Sabine Pass, he would first enter the small pasture of 6000 acres and pass out of that into the large inclosure, with nothing to indicate to him that the fence on the north of the large inclosure was not the southern barrier of the small pasture, or was relied on in any way to inclose the land in question. We can not believe that an inclosure of this character meets the requirements of the statute as to adverse possession. Vineyard v. Brundrett, 17 Texas Civ. App., 147; Brunager v. Bradshaw, 39 Cal., 24.

To constitute such possession there must be, in the language of the statute, an actual and *visible* appropriation of the land, and no such appropriation of the land in question is shown for a period sufficient to sustain appellees' plea of limitation of ten or five years; and they show no such title or color of title as would entitle them to prescribe under the three years statute.

It is unnecessary to discuss the other assignments, because if any material error is shown in any of said assignments, it is not such as is likely to occur upon another trial of this case. The verdict of the jury

in this case being so contrary to the weight and preponderance of the evidence as to be clearly wrong, the court below should have granted a new trial, and it becomes the duty of this court to reverse the judgment of the court below and remand the cause, which is accordingly done.

*Reversed and remanded.*