HYDE et al. v. McFADDIN et al.

(Circuit Court of Appeals, Fifth Circuit.  October 2, 1905.)

No. 1,382.

1. ADVERSE POSSESSION—ACTUAL POSSESSION—CHARACTER OF INCLOSURE.

The inclosure of a tract of land with a large quantity of other lands in a pasture by means of a small amount of fencing, the remainder of the inclosure being by natural barriers, such as streams and bayous, is not such an actual and visible appropriation of such tract as to constitute adverse possession.

[Ed. Note.—For cases in point, see vol. 1, Cent. Dig.  Adverse Possession, § 101.]

2. EVIDENCE—DOCUMENTS—ANCIENT INSTRUMENT.

A deed executed in 1836, conveying land in Texas, is admissible in evidence as an ancient instrument, with the presumptions attaching thereto.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, § 1615.]

3. CANCELLATION OF INSTRUMENTS—UNCONSCIONABLENESS OF CONTRACT.

Evidence considered, and *held* to entitle complainants to the cancellation of a deed to lands in Texas, executed in their behalf by their attorney in fact, and delivered by the local attorney employed by him to institute and prosecute a suit in complainants' behalf to recover the lands, on the ground that at the time the deed was procured to be made and passed to defendant through such local attorney, and under the circumstances shown, it was unconscionable in defendant to demand or accept delivery; the price paid for the land being less than $2 per acre, and it clearly appearing from the evidence that at the time the agreement was made its actual market value was from $10 to $20 per acre, and that at the time the deed was delivered it was worth in the market many times such price, owing to the recent discovery of oil in large quantities in the vicinity, of which facts complainants and their attorney in fact, who lived at a distance, had no knowledge and were not advised by their attorney.

Appeal from the Circuit Court of the United States for the Eastern District of Texas.

W. L. Crawford, Wm. Hepburn Russell, and M. L. Crawford, for appellants.

D. Edward Greer, George C. Greer, and F. C. Proctor, for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge.  The appellants were complainants in the court below.  They showed that they were the children and only heirs of their father, Joshua Burrows Hyde, and, as such, were the owners of an undivided one-half interest in a certain one-fourth of a league of land in Jefferson county, Tex., held adversely to them by certain of the defendants; that on the 13th of January, 1901, the defendant McFaddin did, by fraud, which the bill sets out, procure the execution and delivery to him of the deed dated January 3, 1901, conveying to him the interest of the complainants in this land.  The suit came to hearing, and the Circuit Court passed its decree dismissing the complainants' bill, on the ground that the deed sought to be set aside was duly executed and delivered by the attorney in fact of the complainants, and without fraud.  The appellants submit that this decree is erroneous because the evidence showed: (1) That the deed was not

duly executed by them, nor in their behalf, and was not legally delivered by them, nor in their behalf; (2) that William P. Toler, who executed the deed as attorney in fact, was not lawfully authorized to execute the same; (3) that the power of attorney under which Toler assumed to act was procured by fraud; (4) that the execution of the deed by Toler was procured from him by fraud; (5) that W. L. Thompson, who procured the execution of the deed by Toler, was acting at that time as the agent of the defendant McFaddin, who was thereby charged with notice of Thompson's fraud; (6) that there was a fraudulent conspiracy between Thompson and the defendant to secure the execution and delivery of the deed in fraud of the rights of complainants; (7) that the deed of conveyance to defendants was never legally and properly delivered, but its delivery was fraudulent and void.

The land in controversy was granted by the government to one David A. Cunningham, who on May 18, 1836, duly constituted and appointed Andrew P. Cunningham his attorney in fact to sell the same; and on June 10, 1836, the attorney in fact sold the land to Joshua Burrows Hyde and Paul Joseph Glieses trading in the city of New Orleans, La., under the firm name of Hyde & Glieses, and title thereto was accepted by P. J. Glieses, then and there present, for his firm, their successors and assigns. Afterwards this firm and the individual constituents thereof were adjudged bankrupt by the United States bankrupt court sitting at New Orleans, La.; and on or about January 20, 1843, Richard Brennan, as assignee in bankruptcy of the estate of Paul J. Glieses individually, and as a member of the firm of Hyde & Glieses, executed a deed of conveyance by which he undertook to convey to Theophilus R. Hyde all the interest of the firm of Hyde & Glieses in and to the D. A. Cunningham quarter league of land in Jefferson county, Tex., the land in controversy here. Soon thereafter Joshua Burrows Hyde removed from Louisiana to Connecticut, after which he and his wife went to Europe, and lived there until 1857, when he returned to America and settled in New York City, where he resided until his death on the 15th of March, 1887; his wife having died on the 24th of January, 1886. His children did not know that their father had ever owned any lands in Texas, though they did know from vague rumor prevailing among their kinfolk, who were heirs of Theophilus R. Hyde, their granduncle, that it was believed by these heirs, or some of them, that their granduncle had died the owner of land situated in the state of Texas.

Early in the year 1900, William Pennington Toler, of Westerly, R. I., began investigating this matter, but at whose instance it does not appear, and on the 21st day of May, 1900, he obtained the signatures and acknowledgments of appellants to a power of attorney dated the 29th of March, 1900, which had theretofore been signed and acknowledged by nine donors, and which by the recitations in the body of the power indicated that it was to be signed by numerous others. At the same time he procured from the appellants a power of attorney, dated May 21, 1900, identical in terms—except as to the recited names of the donors—with the power of attorney dated March 29th. Both of these powers authorized the attorney to take possession of, and to recover by suit, all lands in the state of Texas, "to which we may be

entitled by inheritance, purchase, or otherwise." In the early part of the year 1900 W. L. Thompson, of the law firm of Wheat & Thompson, was in the clerk's office in Beaumont, Tex., when a letter from Toler to the clerk was received by the deputy clerk, "asking for some lawyer to investigate the title to this property." The deputy clerk handed this letter to W. L. Thompson and requested him to answer it. The record does not show the earlier stages of their correspondence, and it is not material. On May 26th—five days after procuring the powers of attorney from the appellants—Toler wrote to Wheat & Thompson:

"Please find inclosed power of attorney executed by Lawrence Hyde, only son of Joshua B. Hyde, Margaret A. Hyde, his wife, and Katherine B. Hyde, Joshua B. Hyde's only daughter. I trust you will now be able to enter suit in the federal court, and hope this reaches you in time for filing the papers. Kindly acknowledge and give me an outline of the situation."

This is the power dated May 21st. On May 29th the other power of attorney, dated March 29th, was in Norfolk county, Mass., being then executed and acknowledged by two of the donors who had not previously signed; on the 12th of June it was in the county of New London, state of Connecticut, where and when it was executed and acknowledged by Theophilus R. Hyde and Fannie H. Hyde, his wife; and it was still there on the 27th, when it was executed by Laura Albertina Dennison. The record does not enable us to trace this power from the 27th of June to August 1st, on which last date Toler wrote to Wheat & Thompson:

"Please find inclosed a power of attorney, authorizing the writer to take possession of, and sell, all lands in the state of Texas belonging to the heirs of Theophilus R. Hyde, which said paper is executed by the following (giving the names of the donors to the number of twenty-five, including the appellants). The following have not yet signed, namely, George Macdonald and wife, Alexander P. R. Hanks and wife, William Hanks and wife, Mary E. Benton, and Albert Dennison and wife. Each one of the last-named heirs, excepting George Macdonald and wife, have received a separate power of attorney. I believe all will sign, except the aforesaid George Macdonald. His whereabouts are unknown, and have been unknown for some time. His wife is insane, and is in some retreat on Long Island. I am endeavoring to find where, and who is her conservator or committee of the person. Thinking perhaps you might hasten matters by making all those heirs who have not yet signed defendants, and changing them to plaintiffs later, I deem it best to send you the power of attorney as above indicated. I send you separate power of attorney signed by William P. Hyde and Seraphine S. Hyde, his wife, of California. * * * Hoping you may be able to start the suit upon the papers already sent you, and trusting to hear from you at an early date concerning the taking of the depositions, let me remain."

Col. W. L. Thompson was the father-in-law of Mr. Wheat, the senior partner of the firm of Wheat & Thompson. Mr. Wheat was, during the pendency of the correspondence with Toler, mayor of the city of Beaumont, and much occupied with his official duties, and the dealings with Toler were conducted exclusively by Col. Thompson. He testifies that the partnership was nominal. Mr. Wheat in his testimony says:

"We were partners all right, and if the case had come up for trial I would probably have helped in the court, but in the office I had transactions he had nothing to do with, and he had transactions I had nothing to do with, unless it became necessary to consult about it."

Being asked, "Did you divide fees?" he answered:

"I divided with him, but he seldom divided with me. I never got a cent of the money he received from McFaddin. The colonel is generally in a tight place when he gets hold of money. The colonel was hard run about that time."

Col. Thompson did not enter the suit in the federal court on the receipt of Toler's letter of May 26th, inclosing the power of attorney of May 21st, nor on receipt of his letter of August 1st, inclosing the power of attorney of March 29th.

The defendant W. P. H. McFaddin shows by his testimony that he is a veteran real estate dealer and land litigant of wide experience and repute, and that he is so familiar with the names and situation of the surveys in Jefferson county that he can, from memory, tell an inquirer all about them. Either in September or October he was approached by Col. Thompson on the subject of the interest of the heirs he represented in the Cunningham land. In this connection McFaddin testifies:

"He said he did not believe he could beat me. He thought I had him beat on the question of limitation, and I told him I thought so too, and he wanted to compromise with me on some basis, and I offered him a nominal sum. I do not think I offered him more than $200 or $300, or he could go on with the lawsuit first."

When McFaddin announced that he would pay only a nominal sum of $200 or $300 or stand a lawsuit, the matter dropped. On November 5th Thompson filed the petition in trespass to try title in the name of all the parties who were donors in the power of attorney dated March 29th, and at the same time filed interrogatories to E. B. Brown and Lucy E. Moss to prove the heirship of the plaintiffs in the action. The names of W. P. Toler, Wheat & Thompson, and J. F. Lanier were subscribed to the petition as attorneys for plaintiffs. Citation to appear and notice of the filing of the interrogatories was duly served on the defendants. At that time McFaddin was on a trade with the defendants Chaissons for land including all of the Cunningham survey that was not in McFaddin's small pasture. This negotiation continued, off and on, for about a month, when, in the latter part of October or the first of November, McFaddin and Chaissons finally agreed on a trade. McFaddin then got up an abstract of the title to the Cunningham survey. From this abstract he discovered and learned, for the first time, that Chaissons' title extended only to one half of the land and the heirs of J. B. Hyde owned the other half. Thereupon, he told Chaisson that his title was not good to the J. B. Hyde heirs' interest, unless he had it by limitation. They then resumed their negotiations and reached an agreement. McFaddin then went to see Col. Thompson, and offered him $1,000 for the Hyde interest. Thompson said he did not know whether the heirs would take it, but that he would recommend it. A few days after that Thompson reported that the heirs wanted $1,500, which McFaddin declined, but said he would give $1,200 and Thompson said he would submit that. Then there was a hitch in the trade with Chaisson, and he (Chaisson) went to Thompson, and offered to settle with the Hyde heirs on a basis equivalent to $1,-500, or $1.50 an acre for the quarter league. The next day Chaisson and McFaddin came to terms, and he again went to see Thompson,

who told him of Chaisson's offer. Whereupon McFaddin said: "Will fifteen hundred dollars close the deal with you for all the heirs of Hyde you represent?" and, being answered "Yes," they went together to the office of McFaddin's lawyers, one of whom drew up the paper which they signed.

On November 14th Thompson had telegraphed Toler:

"We are offered one thousand dollars cash for compromise for the land, and our advice is to take it."

Toler answered by wire on November 16th:

"The heirs want fifteen hundred for fourteen interests. Three heirs missing. Answer."

On November 18th Thompson wired:

"Party offers fifteen hundred if all the heirs are secured; twelve hundred for those you represent."

Toler replied same day:

"Accept twelve hundred. Hurry papers. Is my release satisfactory? Write."

Thompson wrote November 20th:

"We have compromised case of Lawrence Hyde et al. v. Beaumont Pasture Company et al., for $1,200 in cash, provided we make proof of heirship. It is agreed that the interrogatories propounded by us shall be answered in full. * * * We have advised this compromise for the reason we are of opinion, after thorough investigation, that we are barred by statute of limitations under our statute. The defendants have had possession, peaceable, and adverse, since 1883. Besides, if this property was community property Maria Conrotte Hyde's heirs would be entitled to one-half of her husband's estate. We send herewith the interrogatories, which please have taken at once and return to C. Dart, Clerk United States Court, Beaumont, Tex. It is agreed that the defendants shall have judgment for the land sued for. It will be necessary for us to have authority to agree to this judgment, and we send you a substitute power of attorney for you to sign and acknowledge before a notary public having a seal."

Toler replied:

By wire: "Heirs forbid substitute power of attorney." And by mail: "Permit me to acknowledge receipt of substitute power of attorney to Thompson; * * * copy of original petition; interrogatories and cross-interrogatories in the case of Lawrence Hyde against Beaumont Pasture Company and others, inclosed with your favor of the 20th. I note by the last named that a compromise of $1,200 in cash has been effected upon proof of heirship. On Tuesday morning next testimony will be taken on the interrogatories furnished. The substance of that testimony will be that Theophilus R. Hyde was married to Agalice Conrotte Hyde during the year 1824. This, in itself, would seem to prove that this property, purchased in 1843, was community property, and that, on the face of it, the heirs of the widow of T. R. Hyde would be entitled to one-half of his share. * * * As I understand the situation, the interest of Joshua Burrows Hyde in the land in question stands unimpeached to the extent of one half of same, the heirs of Theophilus R. Hyde and Mrs. Conrotte Hyde now sharing in the other half of same. * * *"

December 10th Thompson, as he testifies, being "in need of money," applied to McFaddin and obtained $100, and gave him therefor the following voucher:

"Received of W. P. H. McFaddin, $100, on contract of sale of one-fourth league David Cunningham survey in Jefferson county."

### December 12th Thompson wrote Toler:

"Your telegram stating agreement with heirs forbid substitute power of attorney, received. * * * We inclose you herewith two deeds to be executed by you under your power of attorney. Sign the name of each one and yourself under it as attorney in fact. * * * We left the deed blank as to the purchaser, for the reason that the defendants had not determined to whom the conveyance should be made to effect a settlement. The consideration is $1,200 cash, the two deeds calling each for $600. The party insists, however, that they are to have a decree entered in the suit pending in the United States court at its next session, which is next July, confirming their title. Your refusal to give us authority to enter the decree as requested necessitates this action. Sign the deed, and return to us at once, that we may close up the matter according to our written agreement."

### December 17th Toler wrote:

"Replying to your favor of the 12th instant, inclosing deeds, regret greatly could not send substitute power of attorney. Was obliged to enter into an agreement with a committee of the heirs before certain signatures to the power of attorney could be obtained. * * * I note you have forwarded warranty deeds. The heirs cannot warrant this title. They know nothing about it and I still less, and should not under any circumstances execute in their behalf any but quitclaim deeds or deeds of a similar character. Inform defendants' attorney that we withdraw all offers of settlement if case is not settled now, at the same time offering any papers that will permit of entry of judgment as above indicated. Kindly forward new deeds and favor me with an early reply."

### December 22d Thompson wrote Toler:

"We received your letter of December 17th. We regret that our previous letters have not been understood by you. Our compromise of the land matter for the heirs of J. B. and T. R. Hyde is for twelve hundred dollars ($1,200.00) cash, and immediate settlement is intended. If you had sent us authority to have agreed to the decree in the United States Court, you would have long since had the proceeds for the land. We then sent you deeds to execute, and while they were warranty deeds, we did not think it made any difference to our clients. You can change those deeds to quitclaim deeds and return to us, or you can sign the inclosed quitclaim deed in lieu thereof."

On December 28th McFaddin, at the request of Thompson, paid J. F. Lanier $100. On January 4, 1901, Toler writes Thompson:

"Inclosed find quitclaim deed signed by myself in behalf of 17 heirs (not including wives). Have secured signatures of a few more heirs since my last letter. Inclosed find powers of attorney executed by Stella E. Hanks, Malcolm Macdonald, Lillian Macdonald, Flora Macdonald, and Malcolm Macdonald, Sr., and wife, Anna Macdonald. You now have in your possession power of attorney for all the signatures appended to the inclosed deed. Malcolm Macdonald, Sr., died. I send power of attorney executed by himself and wife, also powers of attorney for his three children."

When this letter reached Beaumont, in due course of mail, both Mr. Wheat and Col. Thompson were absent from the city; Mr. Wheat having taken Col. Thompson with him to Chicago. When they got home, probably January 8th, they both learned that the deed had been returned, and Thompson says:

"As soon as I got back home I found the deed was here, and as McFaddin was passing my house I called to him and told him. I was here when the gusher broke loose. I went to see the gusher. I did not go on the 9th (the day it broke loose), but the next day. It had been running at least 24 hours. Either on the 11th or 12th I delivered the deed, with the depositions and all the papers, to Hal Greer (McFaddin's attorney). I had the papers in a big

envelope, and I turned them over to him to examine the deed and the heir-ship."

## McFaddin in his testimony says:

"On Wednesday evening I was coming from the ranch. It was on Wednesday evening before the gusher broke out, which was Thursday, and he told me those papers had come. I was coming right along in front of his house. He stopped me in front of his gate. I was riding along. I told him I would be around the next morning and close it up. The next morning I went down to the ranch, and that morning, while I was down there, the oil broke out, and Lucas came running up to my farm down there very much excited, and wanted me and all my teams to come over there and make a levee to hold the oil, and I went over there with about 20 teams and commenced making a levee to hold the oil. We were working there until night, and it was nearly dark when I got in. The next morning we continued our levee, and I went down there Friday morning and worked all day Friday, and came in late Friday evening, and I came by and told Col. Thompson to bring me the papers down to Greer & Greer, and we would close up the deal the next day, and he said he would do it. So I went up again Saturday, still throwing up levees down there, and I got back home again late Saturday night, and Sunday morning I came to town about 10 o'clock, and I met Hal Greer on the corner and he told me he had the papers of the Hyde heirs and the deed to me, and he said, 'You had better see Thompson and close up the deal,' and I told him all right, and I found Thompson on the street and brought him up here to this office; and when we came in Mr. Greer said we would have to have some revenue stamps, and we got to talking where we could get them. Finally Mr. Thompson asked me if I would go down and find some, and I told him, 'Yes,' and I went down, and met somebody here on the corner—could not find anybody at the bank—I thought maybe I could find somebody and get into the bank; and they told me the only place they knew where to get them was at the Beaumont Lumber Co., Jesse McMahon; so I got in my buggy and went to Jesse's house and he let me have the stamps, and I came on back here, and Thompson and Greer were here, and had the deed all fixed up and ready, and he turned the deed over to me, and Col. Thompson asked me to make out two checks, one for $1,200, and one for $100; so I made him the two checks, one for $1,200 and one for $100, the balance of the money due on the trade."

## Wheat in his testimony says:

"Up to that time, nothing that had taken place in that transaction had interested me at all, and I did not care anything about it. It was one of the private deals the colonel had on hand, and I did not pay any attention to it; but my recollection is he told me, possibly on my return from Chicago, that the Toler deed was here, and I think we discussed it as to whether he ought to deliver it or not. I am not positive now what took place, but I suggested to him not to deliver it, because I considered that, the gusher coming in, the land was of greater value than it was before, and then he told me he was under a contract with McFaddin, and felt that he was morally bound to deliver it. We said very little about it, everything was in such confusion. I was not actively engaged in the law business. I was giving most of my time to the mayor's office. However, I think I told him, when he told me he had delivered the deed, the next day, I told him, 'I am going to try to get that deed back from Greer,' and I met Mr. Greer on the street, and I think Col. Thompson had just told me that morning, and I think he had it in his pocket, and I told him I would like to see that deed, and he would not show it to me, and I think he either said he had instructions from his client not to show it to anybody, or that he did not feel disposed to show it to anybody; that the deed was not going out of his possession."

## Mr. Greer in his testimony says:

"I kept the agreement dated November 19th in our safe. Subsequently Col Thompson informed me that Toler refused to execute a warranty deed. I told

him to see McFaddin, and see whether he would take anything less than a warranty deed. I thought it was satisfactory to do so. On the 12th of January, 1901, I met Col. Thompson, after sundown, and he says, 'Here are those Hyde papers,' and he handed me a bundle of papers. I put them in my pocket, and carried them home with me, and did not examine them until the next morning—Sunday morning. When I examined them the next morning, I found that one of them was a deed executed by William P. Toler, as attorney in fact, in behalf of the complainants in the case No. 61, and there were two or three powers of attorney. * * * The next morning he brought me the depositions. * * * At the time I wrote the contract (November 19th) I required that he go ahead and take those depositions and proof of heirship of those plaintiffs, and I told him I would not agree to accept the deed until that was done. * * * When I inspected the papers Sunday morning, I discovered that the name of the grantee in the deed was blank. There was no grantee in the deed. I had all the papers in my pocket, and I had a call by telephone to come down to the Crosby House, and I went down there, and on my way back Mr. Wheat stopped me, and said he wanted to see those papers. I asked him what he wanted to see them for, and he said in a sort of a joking way, 'That's my business,' and I says, 'Well, it's my business to keep them,' and I walked on. As I came toward my office I met Mr. McFaddin, and told him I wanted to see Col. Thompson, and wanted to see him right away, and he got Col. Thompson and brought him up here. I discovered also that the revenue stamps were missing on the deed, or rather an insufficient amount. At any rate, there were some revenue stamps to be obtained, and I told Mr. McFaddin to go and get them. Just as he left the office, I told Col. Thompson that the grantee's name was left blank in the deed, and he says, 'I will fix that,' and with that he took the deed, and sat down and wrote in the name of W. P. H. McFaddin as grantee, wherever it occurs in that deed. I do not think Mr. McFaddin was present; I think he had gone down for revenue stamps. He handed me back the deed then. I did not scrutinize it very closely after that. McFaddin came back to the office and they discussed the amount that was due. Thompson acknowledged that he had received $100 himself, and that J. F. Lanier had received $100, which left $1,300 due. McFaddin asked him if he wanted it in money or would he take a check. He said the check would suit him very well, and I don't remember whether he gave him two checks or one check. At all events, I suggested to McFaddin to date the checks Saturday, the 12th, as it was Sunday and the banks might raise some quibble about paying them. The checks were drawn I know; if there was more than one they were drawn on the First National Bank of Beaumont, and if there was only one, it was drawn on the First National Bank of Beaumont. He handed the checks to Col. Thompson, and I believe I gave the deed to McFaddin, but I am not sure whether I gave it to him or whether Thompson did. The depositions and powers of attorney and all were left with me until the next morning, when I had the deeds recorded."

The depositions referred to were taken in Toler's office in Westerly, R. I., November 28, 1900, and were properly returned to the clerk of the United States Circuit Court and filed in that court December 3d. The agreement referred to was in these words:

"Beaumont, Texas, Nov. 19, 1900.

"It is agreed between Wheat & Thompson, attorneys for the heirs of J. B. and T. R. Hyde, and W. P. H. McFaddin, that for the interest of said heirs in the David Cunningham one-fourth league of land in Jefferson county, Texas, W. P. H. McFaddin will pay in cash the sum of one thousand five hundred dollars ($1,500.00) as soon as deed is procured from said heirs.

"Wheat & Thompson,
"By Wm. L. Thompson.
"W. P. H. McFaddin.

"Witness:
"Hal W. Greer.
"V. Weiss."

The answer of the defendants Chaissons et al. in case No. 61 was filed November 21, 1900; the answer for McFaddin et al. was filed December 3d. The answer for the Chaissons was a demurrer, plea of not guilty, and general denial. No plea of limitations. The answer of McFaddin was general demurrer, general denial, not guilty, and the three, five, and ten years' limitation as to the 208 acres, more or less, as described in his deed from Jeff Chaisson and J. M. Hebert.

It is averred in the bill in this case, on information and belief, that Toler was advised by W. L. Thompson, in October, 1900, that the land in question was worth from $3 to $5 per acre only, and that the true value of the land at that time was wholly unknown to Toler, who then and afterwards relied fully upon the representations and statements made to him by Thompson, in whom at that time he had the utmost confidence in all respects. The testimony in this case shows that at that time the land in question was in fact actually worth from $10 to $20 per acre for cultivation in rice. The witness C. C. Roberts, who was engaged in real estate business and fire insurance in Jefferson county, in November and December, 1900, on his examination in chief, was asked by the complainants' counsel:

"Q. You think the value of the Cunningham survey of 1,100 acres would have been worth about $20 per acre?
"A. Yes."

### On cross-examination he was asked by the defendants:

"Q. Is it not a fact that there is a great deal of land in Jefferson county susceptible to growing rice, and yet to which no canal is projected, that can be bought now for $10 per acre?
"A. I expect there is, away down below here in places where it is not likely they will get a canal. But ever since I have been here—for the last three years—there has been more or less talk of a canal coming from the Neches river and going through that country, and that had something to do with the price of land there. People were holding it with the hope of this canal being completed.
"Mr. Winslow (complainants' counsel): That projected canal has been built?
"A. I cannot say it is the same canal that was projected, but there is a canal there."

### The defendant McFaddin, testifying on his own behalf, said:

"I was out at the well on the field when it broke out. The first three or four days there was such a flurry and excitement to look at the well, to go and see it spout, that there was not any business done to amount to anything. I think the first trade that was made was made on Saturday, when Charley Ingalls agreed to take $4,000 for his place out there, which was 7½ acres in block 25, or 24, of Spindle Top Heights, right on top of the hill. This was probably 600 feet from the Lucas gusher. That was about the only transaction that transpired at that time, but there was some leasing commenced in three or four days. There were no sales made, no changing of property at all. It was several days before property began to change hands. Values right near the hill went up in a few days after that. They commenced trading some, but there was very little property changing hands on the hill. There was some little, but not a great deal. Most of it had been leased up by Lucas. The outside lands, it was several days before they began changing hands and they commenced at about $100 or $150 an acre. Some lands changed hands for a little more than that, and in February, a little changed for a little more than that, but the close-in property went up to about $500 per acre and the far-off property, still a mile and a half off, did not com-

mence to sell for any great amount, or change hands, until about the first of April. Then some outside property commenced coming in at about $75 to $100 per acre, and some at $50 per acre, and some at $150, and along in there, until after the Beatty well was sold, about the 10th or 12th of April; and then values just went skyward, just kept going until they got to their height about the 25th of April."

On the 23d of January, McFaddin entered into an option which was afterwards closed by contract, whereby he leased about 24,000 acres of land for $5 per acre and one-eighth royalty on the oil which might be taken from it. The $5 an acre amounted to $119,000, $40,000 of which was taken in stock. Only 208 acres of the Cunningham survey (that which McFaddin held by limitation) was embraced in this lease. McFaddin says:

"The Cunningham survey is not all of it good rice land, but there is proba-- bly a thousand acres. In March, 1900, it was not susceptible of being put in rice; there was no canal built then, and there was nothing in that territory to water it. I suppose the actual value at that time was $10 to $12 per acre. I offered for the Glieses title $10,000 for the surface right alone, because I did not believe there was any oil in it. I would as soon have it without, as with the oil rights; that is, since my canal was built."

On the subject of the value of the land, Thompson being examined as a witness, was asked:

"Q. What was that land worth when you delivered that deed? Was not the whole town crazy? Weren't people refusing $1,000 an acre for land all over the county?

"A. It should have sold for $500 or $1,000 per acre."

The depositions which were handed to McFaddin's lawyer to show the heirship of the parties to the deed, with the deed and powers of attorney, were examined and they showed that Theophilus R. Hyde was a married man from the day of his marriage, in 1825, to the time of his death, in 1852; that he never had a child, and that his wife survived him. Therefore, if he acquired any title to the land in Texas by the action of the court of bankruptcy (which he did not, Barnett v. Pool, 23 Tex. 518; Oakey v. Bennett, 52 U. S. 33, 13 L. Ed. 593), or otherwise, after June 10, 1836, it became the common property of himself and wife, and upon his death, the whole of it went to her as the survivor of the community. 1 Pasch. Dig. Laws of Texas, p. 777, art. 4642. These depositions also showed that Joshua Burrows Hyde, having survived his wife, died in 1887, and the appellants are his children and only heirs. In their joint and several answer to the complainants' bill, Clara Chaisson et al. interposed their plea of limitation as to all of the Cunningham survey except the 208 acres, more or less, which had been sold to McFaddin. To support this plea of limitation a volume of evidence was taken before the commissioner and used on the trial. It is unnecessary to rehearse it. The facts therein disclosed, while differing somewhat in their minutiæ are substantially the same in their controlling features as those which appear in the case of Polk v. Beaumont Pasture Company (Tex. Civ. App.; May 22, 1901) 64 S. W. 58, and we concur with that court in its conclusions that an inclosure of the character here shown does not meet the requirements of the statute as to adverse possession. See, also, Vineyard v. Brundrett (Tex. Civ. App.) 42 S. W. 233; Brumagim v. Bradshaw, 39 Cal. 24.

The defendant McFaddin in this suit limits his claim by limitation to the 208 acres, more or less, as described in the deed of date the 7th of February, 1885, from Jeff Chaisson and J. M. Hebert to W. P. H. McFaddin. This claim of limitation the proof in this case supports. The original grant of the land to David A. Cunningham is conceded. Objections were taken to the instruments of evidence offered to show the sale of the land for the grantee by his attorney in fact, on the 10th of June, 1836, to J. B. Hyde and Paul J. Glieses. These objections were not well taken. Frost v. Wolf, 77 Tex. 455, 14 S. W. 440, 19 Am. St. Rep. 761. We recognize the rule announced by Mr. Justice Miller in the Maxwell Land Grant Case, 121 U. S. 380, 7 Sup. Ct. 1028, 30 L. Ed. 949, that:

"Canceling an executed contract is an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear; never for alleged false representations, unless their falsity is clearly proved, and unless the complainant has been deceived and injured by them."

It is elementary. Story's Eq. Jur. § 157. We also recognize the authority of the case of Stockbridge Iron Company v. Hudson Iron Company, 107 Mass. 290, and accept with full concurrence the language which Mr. Justice Peckham uses in Lalone v. United States, 164 U. S. 255, 17 Sup. Ct. 74, 41 L. Ed. 425:

"That the evidence tending to prove the fraud, and upon which to found a verdict or decree, must be clear and satisfactory. It may be circumstantial, but it must be persuasive. A mere preponderance of evidence, which at the same time is vague or ambiguous, is not sufficient to warrant a finding."

In the case we are considering, we have detailed the evidence at some length, and refrain from comment thereon, further than to say that, to our minds, this evidence is clear and satisfactory to the extent of showing that at the time and under the circumstances, and in the manner in which the deed attacked in this proceeding was procured to be made and passed to the defendant McFaddin, it was unconscionable in him to demand or accept delivery of it; and that a court of equity whose jurisdiction is properly invoked should set it aside. It follows that the decree of the Circuit Court must be reversed. The whole matter in controversy between these parties is before this court in this suit, and all the rights of all the parties to the land in question are involved in, and determined by, our decision herein.

The case will therefore be reversed and remanded to the Circuit Court, with directions to that court to enter its decree in favor of the complainants and against all of the defendants, canceling the deed of January 3, 1901, and establishing the title of the complainants to an undivided one-half interest in all of the David A. Cunningham survey not embraced in the 208 acres, more or less, which the defendant W. P. H. McFaddin is entitled to hold under his plea of limitation.