## WALLIS et al. v. LONG et al.
### No. 9772.

Court of Civil Appeals of Texas. Galveston.
Aug. 1, 1934.

Rehearing Denied Sept. 27, 1934.

Stuart R. Smith, of Beaumont, P. C. Matthews, of Liberty, and A. J. De Lange, of Houston, for appellants.

A. W. Marshall, of Anahuac, W. M. Caldwell, of Houston, E. B. Pickett, Jr., of Liberty, and Vinson, Elkins, Sweeton & Weems, of Houston, for appellees.

PLEASANTS, Chief Justice.

This is a suit brought by appellants against appellees to recover title and possession of an undivided interest of approximately 270 acres of land out of a survey of 519 acres, known as the E. H. R. Wallis survey, abstract No. 310, in Chambers county. The petition also seeks recovery of the value of oil alleged to have been taken from the land by the defendants Pure Oil Company and Humble Oil Company. There are more than one hundred plaintiffs and their names need not be here stated. All of them claim as heirs or through and under heirs of the original grantee, E. H. R. Wallis, to whom land certificate No. 70 for 8,276,000 square varas of land was granted and issued by the Republic of Texas in 1838, a part of which certificate was located on the land in controversy on January 23, 1862, and patent to the land thereby appropriated was issued on April 8, 1874.

The defendants in the suit are devisees of Josh J. Mayes, deceased, and their descendants and those holding under them, the two oil companies above mentioned being vendees of the other defendants. There are a number of these defendants and it is unnecessary to here give their names.

The defendants all answered by general demurrer, plea of not guilty, and general denial, and specially pleaded the statutes of three, five, ten, and twenty-five-year limitation (Vernon's Ann. Civ. St. arts. 5507, 5509, 5510, 5519), in bar of plaintiffs' suit. They further specially pleaded:

"That plaintiffs ought not to have and maintain their alleged cause of action against these defendants, because if it could be shown (and defendants deny that such is the fact) that plaintiffs, or any of them, hold, or ever held, the apparent record title to the land sued for by them, they have not exercised any dominion over such land and have not paid any taxes thereon, for one or more years during the period of fifty years next preceding the filing of this suit, but these defendants, and those whose estate they have and hold, have during such period of time openly exercised dominion over and asserted claim to said land and premises, and have paid taxes annually thereon for more than twenty years during such period of time, and this, these defendants are ready to verify."

The trial in the court below with a jury resulted in a verdict in favor of defendants. The jury found that certificate No. 70 was set aside and allotted to Daniel B. Wallis under and by virtue of some order or orders of the probate court of Liberty county made in settling up and dividing the estate of E. H. R. Wallis among his children and heirs, and that Daniel B. Wallis was on the 29th day of May, 1858, the owner of all the unlocated balance of said certificate No. 70, such balance being for 2,847,292 square varas; that all the title of the heirs and children of E. H. R. Wallis in said certificate was divested out of them and vested in J. J. Mayes (the testator under whom appellees hold title) to the extent of the 2,847,292 square varas thereof which was located on the land in controversy, under and by virtue of whatever acts of the probate court, orders, agreements, sales, transfers, or deed that were necessary to divest the title out of the prior owners thereof and vest that title in J. J. Mayes.

They further found that plaintiffs and those under whom they claim had not exercised dominion over the land nor paid any taxes thereon within the period of fifty years next preceding the filing of this suit; and that J. J. Mayes and defendants, who hold under him, have openly exercised dominion over and asserted claims to the land in controversy, and have paid taxes annually thereon for as many as twenty years during the period of fifty years next preceding the filing of this suit; that defendants and those under whom they claim have had peaceable and adverse possession of the land in controversy, using and enjoying the same and paying taxes thereon, and claiming under a deed or deeds duly recorded for as long as five years continuously prior to the filing of this suit. The jury made the same findings as to defendants' adverse possession and their use and enjoyment of the land for ten years prior to the filing of the suit that it made in re-

gard to ·such possession and enjoyment for the five-year period. The time fixed by.the jury in which such adverse possession, claim, and use of the land by the defendants existed was from 1908 to 1929.

The jury further found that J. J. Mayes had no conversation with plaintiff Norman V. Wallis in or about the year 1907, in which he recognized that Sol. B. Wallis and some of his sisters and brothers owned an interest in the land; and that J. J. Mayes did not at that time have any agreement or understanding that he would have the privilege of pasturing and using all the land, and would pay all the taxes.

Upon return of this verdict, judgment was rendered thereon in favor of defendants, that plaintiffs take nothing by their suit.

Under an appropriate assignment and proposition, appellants complain of each of the findings of the jury above stated, upon the grounds hereinafter indicated. Without setting out these propositions in detail, we will consider and determine each of the points presented by appellants in support of their claim that none of these findings should· be sustained. Before doing this, we will make the following general statement of the facts disclosed by the evidence:

E. H. R. Wallis, the ancestor of plaintiffs, emigrated to Texas in 1824 and became entitled to a grant of a league and labor of land from that republic. For that quantity of land, two certificates were issued to him by the government of the Republic in January, 1838, one of which, No. 69, was for 17,724,-000 square varas, and the other, No. 70, for 8,276,000 square varas. Wallis died in 1846 and his estate was administered upon in the probate court of Liberty county, which at that time embraced all of the territory included in Chambers county, which was organized in 1858.

One-half of these certificates for the aggregate of 26,000,000 square varas of land was inherited by the eight children of Wallis by his first wife from their mother, the certificates being the community property of Wallis and his said wife. Wallis married a second time and left two children by his second wife. Upon his death intestate in 1858, the remaining half of the two certificates became the property of his ten children, and his widow.

The records of Liberty county were all destroyed by fire in December, 1874, and the courthouse of Chambers county and all of its records were destroyed by fire in December, 1875.

There is ample evidence to show that there was a division and distribution of the estate of E. H. R. Wallis by the probate court in 1854. There is no direct evidence as to whom certificate No. 70 was allotted, but all of the circumstances disclosed by the evidence are sufficient, we think, to show that it is more probable that D. B. Wallis, in such division and distribution and by deeds and transfers made to him by other children of his father, became the owner of all of certificate No. 70 for 8,276,000 square varas, than that he did not so acquire title to that certificate.

The record shows that on April 6, 1848, he acquired the one-third interest of Sarah Wallis, the widow of Elisha Wallis, deceased, a son of E. H. R. Wallis by his first wife. Thereafter, in March, 1854, three of the other children of E. H. R. Wallis by his first wife transferred and conveyed to D. B. Wallis all of their interest in certificate No. 70. By these transfers D. B. Wallis, who was the son of the first wife, became the record owner of the interests of three of the children who each owned an interest of 931,050 square varas in said certificate, and the interest of Sarah Wallis, who owned one-third of the interest of her deceased husband. When the interest of D. B. Wallis inherited from his father and mother is added to the interests acquired by him through the transfers before mentioned, he owned, after said transfers, 4,034,550 square varas of the certificate. He thereafter, on April 8, 1854, transferred and conveyed to his brother, Sol. Wallis, an interest of 1,034,500 square varas, which left him the record owner of 3,000,050 square varas. On May 29, 1858, he conveyed to J. J. Mayes an interest of 2,847,292 square varas, unlocated balance of said certificate No. 70, for 8,276,000 square varas.

The land in controversy was located and surveyed for J. J. Mayes on January 23, 1862, under certificate No. 70. The field notes of the survey which were filed in the land office on March 31, 1862, describe the tract as containing 2,847,292 square varas, and it is so described in the patent which was issued on April 4, 1874. This original patent, which was introduced in evidence, was found with the old papers of J. J. Mayes after his death. The records of the land office show that this patent was sent direct to Mayes. The receipt for dues on the patent was found with the patent.

▮▮ Under the first three propositions presented in their brief, appellants contend that the evidence taken as a whole is insufficient as a matter of law to support the jury's find-

ing on the issues of five and ten years' limitation. This contention is based on the theory that the possession and use of the property by those in possession have at no time been of such character as to show hostility to appellants' title. In support of this theory, they say that there was no open, visible appropriation and use of the land by Mayes and those who hold under him. The following general outline of the inclosure in which the land was held by Mayes for many years prior to his death in 1912, and by his devisees since his death, is copied from appellants' brief:

"As indicated on the map there was and still is a fence running from the south end of Gum Island Bayou on the Dorr Survey across to the Trinity River, the fence forming the north fence of the cultivated 50 acres (of Mayes' home place on the Dorr Survey). According to the testimony of defendants, the entire colored region lying north from that fence and up the Trinity River and around the end of Lost River and down into the region indicated in pink where the land in controversy and several other tracts claimed by J. J. Mayes are located, was used for many years prior to 1908 by J. J. Mayes and the present claimants for pasturing cattle. It is a low swampy region unsuited to farming and is valuable chiefly for pasturing cattle. For an enclosure keeping the cattle within this vast region the claimants relied principally on natural boundaries. * * * The only artificial boundaries enclosing the vast pasture was the fence between the end of Gum Island Bayou and the Trinity River on the south above referred to and a short fence about 800 feet in length between Cut Off Bayou and Labet's Bayou shown at the northwest extremity of the colored area.

"Thus it will be seen that the boundaries of the pasture are formed as follows:

"Commencing with the intersection of the South fence on the Edw. Dorr tract with the Trinity River; thence up the West side of the Trinity River with its meanders to the intersection of Picket's Bayou with Trinity River; thence down Picket's Bayou to Cut Off Bayou at the Northwest corner of the Chas. Dorsett Survey; thence down Cut Off Bayou to the West side of the pink area to the point marked fence; thence down this fence to Labet's Bayou; thence South along the Bayou to Lost Lake; thence around the Northern and Eastern shores of Lost Lake Southward to Lost River; thence up the West side of Lost River to its head, the Southern part of the Chas. Dorsett Survey; thence down the East side of Lost River to

Gum Island Bayou; thence Southward with Gum Island Bayou to the end of the South fence; thence with that fence Eastward to the Trinity River, the place of beginning. The map is drawn to a scale of 800 feet to the inch. Applying this scale it will be seen that the south fence is less than 2,000 feet in length and that the fence at the Northwest corner of the pasture is less than 800 feet in length. Coupled with these two artificial boundaries situated many miles apart and totalling less than 3,000 feet, the defendants relied on natural boundaries aggregating more than 29 miles. There is some conflict in the testimony as to whether Picket's Bayou constitutes a sufficient barrier to turn stock. However, the evidence is sufficient to warrant the jury in finding that all of the natural boundaries relied on as above indicated are sufficient and have all along been sufficient to form a barrier against the passage of stock out of this area or into it.

"It is undisputed in the evidence that neither the defendants, nor anyone under whom they claim, nor anyone else for that matter, has ever made any improvement of any kind on the 519 acres in controversy. It is now, and has been at all times in the past, just as nature left it. The short fence on the northwest, sometimes referred to as the Griffith fence, is about a mile and a quarter northwest of the northern boundary of the land in controversy."

We think these admissions in appellants' brief in themselves destroy their contention that the evidence "is insufficient as a matter of law to show an actual, visible, exclusive appropriation of the land hostile to the claim of appellants."

The following additional facts are shown by abundant evidence, most of them by the undisputed evidence: Shortly after he located the 519-acre tract, under the unlocated balance of certificate No. 70, conveyed to him by D. B. Wallis, Mayes began to purchase other tracts of land within the large pasture within which he was keeping his cattle, and by 1890, if not earlier, he owned all of the land in that inclosure, which the undisputed evidence shows contained less than 5,000 acres. The two short fence boundaries were kept up by Mayes during his lifetime and by his devisees thereafter.

The whole of the inclosure was used by Mayes and his children, and their descendants at all times for the pasturage of their cattle. Such being the facts, if an owner of the 519-acre tract had gone on that land at any time during the period from 1908 to 1929, fixed by the jury as the period in which they

142

found appellees had adverse possession of the land, under the five and ten-year statutes of limitation (Vernon's Ann. Civ. St. arts. 5509, 5510), he could only have gotten on the land by crossing a natural or artificial barrier sufficient to make the possession by the claimants of the large inclosure actual and exclusive; and if he had continued all around such inclosure, he would have found similar barriers for the entire distance. He would have also found Mayes cattle with his brand on them all over the pasture and would have found no one occupying any land in the inclosure or having any cattle thereon other than Mayes, his children, and devisees. We do not think that it can be doubted that these facts show an actual, visible appropriation of the land by appellees. The use and enjoyment of land necessary to make its possession adverse under our limitation statutes is only that to which the land is adaptable and capable of being used, Billingsley v. Houston Oil Co. (Tex. Civ. App.) 182 S. W. 373, 374; Dunn v. Taylor (Tex. Civ. App.) 107 S. W. 952. The undisputed evidence shows that the 519-acre tract, as well as all of the rest of the land in the inclosure, could only be used for pasturage purposes. The inclosure, a large portion of which was entirely surrounded by water, was generally known in the community as "Mayes Island" or "Mayes Pasture."

In the cases cited by appellants to sustain their contention on this question, the facts are wholly dissimilar. In the case of Polk v. Beaumont Pasture Co., 26 Tex. Civ. App. 242, 64 S. W. 58, the facts showed that a public road and also a railroad traversed the large pasture which contained more than 50,000 acres of land; that numbers of persons owned land and kept cattle in this large inclosure; at one settlement in the pasture at which a post office was maintained, there were fifteen families. The facts in the other case cited by appellants to support their contentions are just as dissimilar from the facts of the instant case as the facts in the Polk Case, supra.

■ Appellants further insist that the possession and use of the land by appellees cannot be held adverse to appellants who were their cotenants. If it be conceded for the sake of argument that any of appellants were cotenants of appellees in the 519-acre tract, appellees' long continued open, notorious, and exclusive claim and use of the 519-acre tract was in our opinion such as to charge their cotenants with notice of appellees' repudiation of their claim. Illg v. Garcia, 92 Tex. 257, 47 S. W. 717; Stiles v. Hawkins (Tex.

Com. App.) 207 S. W. 89, 95. All of the acts of appellees in reference to the 519-acre tract affirmatively show their adverse possession as against all other claimants of the property, and there is nothing in the record by which such acts can be explained so as to show consistency with any joint title of appellants with appellees in the property. Coleman v. Buttram (Tex. Civ. App.) 40 S.W.(2d) 977, 978; Tinsley v. Mays (Tex. Civ. App.) 251 S. W. 577; Huling v. Moore (Tex. Civ. App.) 194 S. W. 188.

Appellants introduced evidence tending to show an acknowledgment by Mayes of the joint ownership of some of the appellants of the land in controversy, but the jury, upon sufficient evidence, found against appellants on this issue, and appellants' brief does not complain of this finding.

■ We are also unable to agree with appellants' contention that the evidence was insufficient to sustain the findings of the jury upon the issue of presumption of a grant. It seems clear to us from the evidence that the findings of the jury upon this issue should be sustained. In his various dealings with the state land office, D. B. Wallis claimed to be the owner of certificate No. 70, and the land office appears to have recognized his ownership and to have so dealt with the certificate. Prior to his sale to Mayes of the unlocated balance of 2,847,292 square varas above mentioned, he had located 5,428,708 square varas of certificate No. 70 on land in Liberty county by survey made in 1852. In 1878, this location upon the Liberty county land (the land then being in San Jacinto county which was formed out of territory originally embraced in Liberty county) was abandoned by D. B. Wallis. In accomplishing his abandonment of the location and the lifting of the certificate, he appointed J. H. Collet of Travis county his agent and attorney "to apply to the Commissioner of the General Land Office and get said balance lifted, and to receive and receipt for the same." In this instrument, which was sworn to by Wallis, he recites that he is the owner of the 5,420,100 square varas of the certificate under which the location was made, and that "he abandons said survey and surrenders all claim thereto by reason of the file and entry made by him by virtue of said balance certificate." The unlocated balance of the certificate was finally obtained from the land office by Collet and sent to Chambers and Jackson, the attorneys for D. B. Wallis, in February, 1878. Thereafter in 1878, D. B. Wallis executed a release and conveyance of this unlocated balance to his attorneys,

Chambers and Jackson. This conveyance was filed for record in Chambers county on April 1, 1879, but in the meantime the grantees, Chambers and Jackson, had filed with D. B. Wallis, county surveyor of Chambers county, applications for surveys of locations they desired to make under said certificate. These applications were filed in the county surveyor's office on March 19, 1878, and copies filed in the land office on November 6, 1878. These locations were made and patents therefor issued by the land office.

Every fact necessary to sustain a finding that a grant of the certificate or the land had been made to D. B. Wallis by the other heirs of E. H. R. Wallis is shown in the case by ample evidence. He and Mayes and those holding under Mayes have exercised dominion and every act of ownership over the land for more than fifty years. The appellants and those under whom they claim lived in the neighborhood of the land and must be charged with knowledge of all these acts of dominion and ownership. Not having asserted any claim of ownership in all these years, the jury were warranted in finding that they had acquiesced in Mayes claim of title and that it was therefore more probable that appellants had transferred their title to the certificate or the land to D. B. Wallis or J. J. Mayes than that said Wallis or Mayes had not so acquired appellants' title.

We think the facts of this case call for the application of the doctrine of presumption of a grant. This doctrine has been long recognized and applied by the courts of this state. We cite, among the many cases that have expounded and applied this doctrine which is now a settled rule of decisions in this state, Magee v. Paul, 110 Tex. 470, 221 S. W. 254; Pratt v. Townsend (Tex. Civ. App.) 125 S. W. 111, 115; Surghenor v. Ayers (Tex. Civ. App.) 139 S. W. 28; Fowler v. Texas Exploration Co. (Tex. Civ. App.) 290 S. W. 818; Miller-Vidor Lumber Company v. Schreiber (Tex. Civ. App.) 298 S. W. 154.

Appellants also complain of the rulings of the trial court refusing to sustain their motion for a change of venue on the ground of the existence of such prejudice against the rights of appellants in Chambers county, among the qualified eligible jurors of the county, that they could not obtain a fair and impartial trial on the facts in said county; and their motion for new trial upon the ground of misconduct of the jury.

■ The motion for change of venue was based largely on an article which was published in "The Progress," a newspaper published in Anahuac, the county seat of Chambers county, on January 31, 1930, a few months after the suit was filed and a few months prior to the trial in the court below. It is unnecessary to set out this article in full. It is sufficient to say that it mentions a suit brought in Jefferson county several years prior to the date of the article, by a New York negro to recover land in Liberty county oil field and for an accounting for oil taken therefrom by the Gulf and Humble Oil Companies, the amount claimed by the plaintiff as the value for the oil taken from the land being $500,000. The article then states that the suit, after being fought over in the courts for three years, resulted in a judgment for plaintiffs for $100.

The writer of the article then makes the following statements and observations:

"It's strange, but true, whenever an oil field is found, there is litigation to land titles from beginning to the end of a field. There are still people litigating over the Spindle Top oil field struck 29 years ago. There is now a suit starting to claim a hunk of the Lost Lake field involving the Mayes Estate near Wallisville, where an oil field was struck a year ago, which lands have been in the hands of the Mayes heirs for 70 years. And on down the line. Suits filed in Liberty County last week against the Gulf Production Company of Hankamer for interests in the George Singler survey, where now a well is being drilled on the Weiser lands.

"Most of the time people are illy advised through some 'jimcrow' lawyer who bleed the poor public with advance money, 'fight the case' and maintain at least half his interest if the suit is won."

Of course, the publication of this article could not, of itself, disqualify all the jurors in Chambers county. Any individual juror who had read the article and had therefrom formed an opinion on the merits of the appellants' case would be disqualified. The extent of such disqualification of jurors of the county was a question of fact. There was a hearing on this issue and the evidence is amply sufficient to sustain the trial court's holding that appellants could obtain a fair and impartial jury in Chambers county to hear and determine the facts of their case.

■■ The motion for new trial, on the ground of misconduct of the jury, is based upon the affidavit of one of the plaintiffs and two other affiants. This motion alleges, in substances, that six of the jurors who tried the case boarded during the trial, which lasted for ten days, at the hotel in Anahuac, which

was owned and operated by W. R. Sherman and his wife, who were defendants in this suit; and that four others of the jurors took their meals at this hotel; that this hotel had been owned and operated by Sherman and his wife for a number of years; that Sherman was sheriff and tax collector of Chambers county, and had held that office for eighteen years, and at each court term the hotel so operated by Sherman and wife entertained as guests a large number of the persons in attendance upon the court; and that Sherman and his wife were well acquainted with a large number of the people of the county, and plaintiffs believe were personally well acquainted with all of the jurors who tried the case. It is further alleged that none of these jurors were under the rule and "that they associated indiscriminately around the hotel lobby and around the hotel with defendants and their witnesses, sat at the table with them, and in general were subjected to a general atmosphere, if not actual conversation, favorable to defendants case and highly prejudicial to the plaintiff." It is also alleged in substance that none of plaintiffs or any of their witnesses stopped at this hotel, "but that it was to all intents and purposes a sort of headquarters for the defendants and their witnesses throughout said trial." The court heard evidence from the jurors and others upon the issues presented by this motion. We deem it unnecessary to set out the evidence which is copied at length in the brief. The testimony fails, in our opinion, to show any misconduct on the part of any of the jurors which required the trial court to set aside the verdict. The determination of motions for a new trial on the ground of misconduct of a jury is largely left to the discretion of the trial court, and the ruling of that court thereon should be sustained on appeal unless it can be held from the record in the case that the trial court abused his discretion in his ruling on the motion. Bendelin v. Thompson (Tex. Civ. App.) 33 S.W.(2d) 220, 222; James A. Dick Co. v. Yanez (Tex. Civ. App.) 55 S.W.(2d) 600, 604. We cannot so hold upon the evidence in this record, but, on the contrary, find ample evidence to sustain the court in refusing to grant the motion.

Our conclusions upon the questions which we have hereinbefore discussed and decided render it unnecessary for us to pass upon other questions raised and presented by the briefs. We think the judgment should be affirmed and it has been so ordered.

Affirmed.