## McFADDIN, WIESS & KYLE LAND CO. et al. v. TEXAS RICE LAND CO.
### (No. 612.)

(Court of Civil Appeals of Texas. Beaumont. June 6, 1923. Rehearing Denied June 20, 1923.)

1. **Trespass ⟨⟩19(1)—Party seeking to recover rental value must show title.**

Plaintiff, suing for rental value of land as damages for withholding of possession from its predecessor in interest, must show title to the land in its predecessor during the period for which rent is claimed.

2. **Limitation of actions ⟨⟩104(1)—Rule as to concealment of cause of action to be applied strictly and sparingly.**

While fraudulent concealment of cause of action by defendant, accompanied by plaintiff's failure, after exercising ordinary diligence, to discover such concealment, will avoid statute of limitations, the rule should be given strict and sparing application.

3. **Limitation of actions ⟨⟩197(2)—Evidence held to support finding of concealment of facts as to party liable, but insufficient to show diligence.**

Evidence in action for rental value of land, possession of which was withheld, held sufficient to support finding that possession was held ostensibly in name of one partner and corporation for fraudulent purpose of concealing partnership's possession, but insufficient to show proper diligence on part of plaintiff and its predecessors to discover the facts.

4. **Limitation of actions ⟨⟩95(2)—Plaintiff not entitled to rely on person's statement as to possession of land as excuse for delay after testimony given by him in conflict therewith.**

Where M., in previous suits, testified that he was in possession of land for himself as to

part thereof and for a corporation as to the other part, plaintiff and its predecessors in interest could not thereafter rely on statement previously made by him that he was in possession individually, as excuse for delay in suing a partnership for withholding possession from them.

**5. Limitation of actions ⬿95(2)—Failure to exercise diligence not excused by fact that inquiry of certain persons would have been fruitless.**

Where M., a member of partnership which withheld possession of land from plaintiff and its predecessors in interest, had stated that he was in possession individually, but later testified that he was in possession of part for himself and of part for a corporation, the fact that further inquiry of him or his partners would probably have not developed anything further *held* not to relieve plaintiff or its predecessors in interest from exercise of diligence to discover identity of party liable.

**6. Partnership ⬿191—Not separate entity and cannot sue or be sued.**

Partnership is not separate entity, and, having no legal existence, can neither sue nor be sued, and judgment cannot be rendered for or against it, though under Rev. St. arts. 1863 and 2006, its property may be reached by suit against the partners and service on at least one.

**7. Partnership ⬿153(1)—Cause of action for trespass committed by member is against individual members and not firm.**

Partnership cannot commit trespass or tort, and hence cause of action for trespass committed by partner within scope of partnership business was against the individuals composing the firm, and not the firm itself.

**8. Partnership ⬿174—Members jointly and severally liable for trespass by one within scope of partnership business.**

Members of partnership are jointly and severally liable as individuals for trespass committed by one of them within scope of partnership business.

**9. Limitation of actions ⬿174(1) — When cause of action barred against wrongdoing partner, it was barred as to others.**

Where cause of action for trespass committed by partner within scope of partnership business was barred by limitations as to him because his connection with the trespass had not been concealed, it was barred as to the others, in absence of fraudulent conduct on their part.

**10. Partnership ⬿125—Partner acts for himself and as agent of others.**

As to third parties, each partner is, by implication, the agent of every other partner with respect to partnership affairs, and acts as principal for himself and as agent for his partners.

**11. Judgment ⬿630—In favor of partner held bar to action against him or the other partners.**

As cause of action for trespass by partner within scope of partnership business was not against the partnership, liability being joint and several, judgment in his favor denying recovery of rental value as damage barred action against him and also against the other partners.

Appeal from District Court, Jefferson County; W. H. Davidson, Judge.

Suit by the Texas Rice Land Company against the McFaddin, Wiess & Kyle Land Company and others. From a judgment for plaintiff, defendants appeal. Reversed and rendered.

E. L. Nall, C. W. Howth, and Oliver J. Todd, all of Beaumont, for appellants.

E. E. Easterling, W. E. Orgain, and Geo. C. O'Brien, all of Beaumont, for appellee.

FOSTER, Special C. J. This suit was instituted on January 3, 1916, by Texas Rice Land Company, plaintiff below and appellee here, against W. P. H. McFaddin, W. W. Kyle, Mrs. Laura E. Wiess, Percy H. Wiess, Mrs. Ruth Branham and husband, Hal H. Branham, the McFaddin, Wiess & Kyle Land Company, a joint-stock association, and Thomas H. Langham, its receiver, defendants below. Before the cause was tried plaintiff dismissed as to all defendants except the defendants W. P. H. McFaddin, W. W. Kyle, P. H. Wiess, and Mrs. Ruth Branham, who are appellants here; the dismissal as to Hal H. Branham being occasioned by his death.

The action was for damages as for the rental value of 440 acres of land, being an undivided one-half interest in a larger tract in the David Cunningham survey in Jefferson county, Tex., alleged by plaintiff to have been wrongfully and unlawfully withheld from the possession of the American Oil & Refining Company of Texas, plaintiff's predecessor in interest, during the years 1901, 1902, and 1903, by the McFaddin, Wiess & Kyle Land Company, a partnership composed of the said W. P. H. McFaddin, V. Wiess, and the said W. W. Kyle. It was alleged by plaintiff that V. Wiess died prior to the filing of the suit, leaving a large estate amounting to more than plaintiff's demand, and which was received and appropriated by his widow and heirs, the said Laura E. Wiess, P. H. Wiess, and Ruth Branham, respectively, who thereby became liable upon plaintiff's demand against the said V. Wiess as a member of the said partnership. Plaintiff alleged and proved that it owned the cause of action for rents in favor of the American Oil & Refining Company of Texas, as the transferee of the latter company. The trial resulted in a verdict and judgment in favor of the plaintiff for $83,212.60, from which judgment the defendants have appealed.

To suspend the running of the statute of limitations plaintiff alleged fraudulent concealment of the cause of action by the defendants and that it was unable to discover such concealment until less than two years prior to the filing of the suit. The evidence

introduced in support of the allegations will be discussed later.

This is the last of a series of suits involving controversies, in one form or another, over the Cunningham survey, covering a period of more than 20 years, and to which the litigants here, or their privies, have been parties. In most instances the chief participants have been Charles J. Chaison, an heir of Jef Chaison, deceased, acting for himself and as the representative of the other heirs of said Jef Chaison and his widow, Clara Chaison, and as the representative of their corporations, the American Oil & Refining Company of Texas and Texas Rice Land Company, on the one side, and W. P. H. McFaddin, acting for himself and as the representative and a member of McFaddin, Wiess & Kyle Land Company, a partnership, McFaddin, Wiess & Kyle Land Company, a joint-stock association, and McFaddin-Wiess Canal & Irrigation Company, a corporation.

A statement at some length of the preceding controversies will lead to a better understanding of the suit.

In 1900 McFaddin claimed 208 acres of the Cunningham survey in a separate tract, through purchase from Hebert and Jef Chaison, and the Chaisons claimed the balance of the survey. The record title to the survey was in Hyde & Gleises, a partnership, or their heirs, and the only meritorious claim McFaddin and the Chaisons had was based upon limitation.

The dispute between Chaison and McFaddin began in 1901, when on January 10th, the day the Lucas gusher came in, Chaison refused to consummate a contract theretofore made with McFaddin to sell the latter the Cunningham and other lands, and when McFaddin on January 13th purchased the Hyde title, which, Chaison claims, he had theretofore agreed to do for their joint benefit, denied that the purchase was for the joint account, and in the same month took possession of the Cunningham survey, fenced it, and by the fence and threats of physical violence upon the Chaisons kept them out of possession during the period for which rents are herein claimed. Chaison, it appears, had the legal right, under a provision of the sale and purchase contract, to refuse to consummate the contract by paying liquidated damages, and he exercised such right. But McFaddin was offended, and the parties have been unfriendly ever since.

The Hydes instituted suit in the federal court (140 Fed. 433, 72 C. C. A. 655), in equity cause No. 21, against McFaddin, the Chaisons, V. Wiess, W. W. Kyle, and the American Oil & Refining Company of Texas, to cancel the deed made to McFaddin on January 13th by their attorney in fact and to recover their interest in the Cunningham survey. The deed was canceled and the Hydes recovered an undivided half interest in all of the survey, except the 208-acre tract.

After the recovery by the Hydes of the undivided interest, they sold it to V. Wiess, who, while taking the deed in his name, purchased it for the benefit of McFaddin, Wiess & Kyle Land Company, the joint-stock association, which had been organized on June 27, 1904, and which on that day succeeded to the rights of McFaddin, Wiess, & Kyle Land Company, the partnership, composed of W. P. H. McFaddin, V. Wiess, and W. W. Kyle. The partnership was dissolved on that date.

On February 2, 1901, after W. P. H. McFaddin had taken exclusive possession of the land under the circumstances above stated, the Chaisons instituted suit against McFaddin in the district court of Jefferson county, Tex., in cause No. 2694, styled Clara Chaison et al. v. W. P. H. McFaddin, for the recovery of all of the survey except the 208 acres and for rents and damages. They alleged that the purchase by McFaddin from the attorney in fact for the Hyde heirs was made for their joint benefit to perfect their respective titles, and that McFaddin had taken the deed in his own name to defraud the Chaisons and refused to recognize their rights under the purchase.

The American Oil & Refining Company of Texas, a corporation, acquired the rights of the Chaisons, and said corporation and its receiver, J. D. Martin, became intervening plaintiffs in said cause No. 2694, and as successors in interest of the Chaisons prayed for the land and rents. Later Texas Rice Land Company, a corporation, became an intervening plaintiff in said cause No. 2694, as the successor in interest of the American Oil & Refining Company of Texas; and V. Wiess, who had purchased the Hyde title after it was established in the federal court, also intervened, praying for said interest. The heirs of Paul Gleises, a member of the firm of Hyde & Gleises, also intervened. They held the record title to an undivided half of the survey.

The Chaisons and their successors, the two corporations mentioned as intervening plaintiffs, claimed rents on the land at the rate of $6 per acre for the years 1901, 1902, 1903, and a part of 1904. They also filed in said cause a cross-action against the Gleises heirs for the land and for rents for the same period.

There were two trials of said cause No. 2694, one in 1909 and the other in 1912; the last resulting in a judgment on March 4, 1912, in favor of the plaintiffs therein for an undivided half of the survey, less the 208-acre tract. They recovered on their limitation plea against the Gleises heirs. V. Wiess recovered the other half interest. The judgment, however, was in favor of McFaddin on the issue of rents. The judgment is silent on the issue of rents between the Gleises heirs and the plaintiffs in said cause.

On the trials of said cause No. 2694 Mc-

Faddin testified that he had not had possession of the land in his own right, but as the representative and officer of the McFaddin-Wiess Canal & Irrigation Company, a corporation, that had entered under valid leases from the Gleises heirs, and the leases were introduced. Upon this evidence the court denied the Chaisons, the American Oil & Refining Company of Texas, and Texas Rice Land Company, a recovery for rents.

On September 26, 1914, the Texas Rice Land Company filed suit, in cause No. 10597, against the widow and heirs of V. Wiess, deceased, but the joint-stock association, the beneficial owner of the Wiess title, was not joined as a defendant. The widow and heirs of V. Wiess filed their acceptance of service on October 6, 1914, and on the same day judgment was rendered against them by default for all of the Cunningham survey, except the 208-acre tract. It had been agreed between the parties that the suit should be filed and that there should be a judgment by default. The Texas Rice Land Company knew at the time that the joint-stock association was the real owner and that V. Wiess had held the land as trustee.

On February 9, 1915, Thomas H. Langham, as receiver of the joint-stock association, filed suit in the district court of Jefferson county, in cause No. 10847, against Texas Rice Land Company, to recover all the Cunningham survey except the 208 acres. The receiver alleged the fact of the default judgment by agreement against the widow and heirs of V. Wiess, and that the Texas Rice Land Company knew at the time that V. Wiess held the land in trust for the joint-stock association, but that, the apparent title being in V. Wiess and his heirs, the judgment in cause No. 10597 constituted a cloud on the title of the joint-stock association, and asked that the cloud be removed. The receiver also pleaded limitation under the five and ten year statutes. The receiver recovered judgment against Texas Rice Land Company for an undivided half interest in the land sued for; it being the interest that V. Wiess had held in trust. Rent on the interest for 1915 was also recovered.

On the trial of that suit one Henry Davidson, a witness for the receiver, testified that McFaddin, Wiess & Kyle Land Company, the partnership, was in possession of the land in 1901, 1902, 1903, and for a part of 1904, and that upon the dissolution of the partnership in 1904 the joint-stock association of the same name took possession. This brings us to the present suit, which was filed within two years after the witness Davidson testified as above stated.

[1] As one of the conditions precedent to a recovery for rent, it was necessary for the plaintiff, Texas Rice Land Company, to show that its predecessor in interest had title to the land for and during the period for which rent was claimed. The evidence introduced established title by limitation in such predecessor, the American Oil & Refining Company of Texas, to an undivided half interest.

The evidence is sufficient to support the finding of the jury that McFaddin, Wiess & Kyle Land Company, the partnership, had possession during the period for which rents are claimed, and such finding is adopted. This, of course, includes the further finding that the ostensible possession of W. P. H. McFaddin, or the McFaddin-Wiess Canal & Irrigation Company, was for the use and benefit of the partnership.

Plaintiff, appellee here, claims that neither it nor its predecessors in interest had any knowledge of the possession by the partnership until Davidson testified; that they had no means of acquiring such knowledge before then, and could not have acquired such knowledge by the exercise of ordinary diligence; that the partnership had concealed the facts with reference to said possession and had represented others to be in possession for the purpose of deceiving and misleading the plaintiff and its predecessors. The jury found in favor of plaintiff on this issue.

A discussion of the hundred and more questions raised by the assignments would extend this opinion to undue limits. We shall therefore discuss only a few of the questions presented, but which will, in our view, dispose of the case finally.

Appellants assign as error the action of the court in refusing to instruct a verdict in their favor, for the reason that the cause of action was barred by the two-year statute of limitation. After careful consideration of the record and briefs we have concluded that this assignment should be sustained. It is apparent the suit is barred unless appellee has proven a case that falls within one of the exceptions that suspend the operation of the statute. The burden, of course, was upon appellee to establish such a case.

[2] It relies upon the rule that fraudulent concealment of the cause of action by the defendant, accompanied by the plaintiff's failure, after exercising ordinary diligence, to discover such concealment, will avoid the statute. This rule is followed in Texas and appears to be in harmony with the weight of authority. The reason of the rule is that a party cannot in good conscience avail himself of the statute when his own fraud has prevented the other party from knowing his rights. Munson v. Hallowell, 26 Tex. 475, 84 Am. Dec. 582.

As the rule is an exception ingrafted on a legislative enactment by the courts and in conflict with the general policy of statutes of repose, we think the rule should be given a strict and sparing application, and we believe such has, in general, been the policy of judicial opinion in Texas. A short review of the authorities will be helpful.

In T. & P. R. R. Co. v. Gay, 86 Tex. 608, 26 S. W. 614, 25 L. R. A. 52, the court said:

"The rule in this state is, that the fraudulent concealment of plaintiff's cause of action takes the case out of the bar of statutes of limitations. * * * The limitation on this rule is, that a plaintiff cannot excuse his delay in instituting suit on the ground of fraudulent concealment of his cause of action, if his failure to discover it is attributable to his own neglect; and whether such neglect existed in a given case must be determined from the facts of that case."

In Prosser v. Bank (Tex. Civ. App.) 134 S. W. 781, the court said:

"It is the law in this state that neither fraud alone nor ignorance of its existence will prevent the statute of limitation from running. The ignorance which effects such a result must be attended with such concealment of the fraud as will prevent its discovery by the exercise of reasonable diligence."

If a party fails to avail himself of the means of information that would lead to discovery of his cause of action, he cannot maintain his suit after limitation has begun to run. Powell v. March (Tex. Civ. App.) 169 S. W. 939.

In Kuhlman v. Baker, 50 Tex. 630, the plaintiff sued defendant for the return of purchase money paid defendant upon a quitclaim deed, represented by defendant to be a general warranty deed. The defendant was an attorney, to whom it was plaintiff's habit to go for advice; plaintiff could not read nor write, and defendant knew that plaintiff had confidence in him and relied upon his representations, which were fraudulently made to induce plaintiff to buy the land; the plaintiff never thereafter informed himself of the contents of the deed until he was sued for the land 17 years later. The court held that plaintiff was barred, saying:

"If after over 17 years this suit may be maintained on the excuse that the plaintiff neglected to have his title examined until he was sued for the land, the effect would be to allow such suits to be brought at any time when the nature of the deed is first discovered, no matter how great the lapse of time."

In Boran v. Boran, 38 Tex. Civ. App. 139, 85 S. W. 48, the plaintiff owned an interest in his father's estate under his will, which was of record. Plaintiff was young and inexperienced, lived with the defendant, an older brother, who had charge of the estate and in whom plaintiff had confidence. Defendant fraudulently represented to plaintiff that the latter had no interest in the estate and thereby induced the latter to make defendant a deed to certain land. Plaintiff, 11 years thereafter, sued to cancel the deed. The court held plaintiff negligent in not informing himself as to his rights and that his action was barred.

In Cooper v. Lee, 75 Tex. 114, 12 S. W. 483, the plaintiff, Lee, was old, with impaired eyesight, and was induced by the defendant Pierce, his son-in-law, an attorney, to make the latter a deed to land in Tarrant county in exchange for a deed from defendant to other land which defendant did not own. Plaintiff lived in defendant's house as a member of the family, and the relation between them was one of confidence and trust; defendant being plaintiff's attorney in all law matters. The plaintiff, on account of his trust in defendant and upon the latter's advice, did not record the deed from defendant to plaintiff. Defendant later asked to see the deed, which was delivered to him, and he refused to return it to plaintiff; his purpose being to get possession for the purpose of destroying it. Defendant's representations and conduct were fraudulent and for the purpose of obtaining plaintiff's property without consideration. Plaintiff sued on the 4th day of February, 1887, to recover the land he had conveyed to defendant in November, 1881, under the circumstances related, alleging that he did not discover the fraud until November, 1886. The court held that plaintiff's suit was too late. The court said:

"While we are not prepared to say that the relation of attorney and client which, existing between Pierce and Lee, justified Lee in relying upon the representations of Pierce so as to absolve him from the necessity of making any investigations before the transaction was completed would immediately cease to protect him upon the completion of the transaction, so as to require him at once to make inquiries to ascertain the truth of the representations upon which he had acted, we still do not on the other hand believe that the continued existence of the relation justified him in neglecting every precaution that a prudent man would exercise about his property. * * * The petition alleges that the trade with regard to the Tarrant county land was made in November, 1881. More than six years elapsed between that date and the commencement of this suit. Plaintiff may be allowed more than two years from the date of the transaction to ascertain such facts as it was his interest to learn, without regard to his confidential relations to other people, and still have more than four years left before he filed his suit. Conceding his right to a reasonable allowance of time growing out of the circumstances under which he made the trade, before Lee could be required to begin, we think it would be an unreasonable application of the rule to allow him as much time as is required to relieve him from the effect of the statute of limitations in this case."

In Cleveland v. Carr (Tex. Civ. App.) 40 S. W. 406, it was shown that the plaintiff, Carr, was induced by defendant, Cleveland, a wholesale merchant, and one Chandler, who was then insolvent, to become a partner in Chandler's business; that plaintiff did not know Chandler was insolvent, but defendant did, and defendant induced plaintiff to become a partner and to borrow, by deed of

trust on his land, $10,000 to put into the business, so defendant might have the opportunity of collecting $7,000 that Chandler then owed him; that defendant acted as plaintiff's agent in borrowing the money from one Brown and was to place the money to the credit of the new firm, who would continue to make purchases as needed, but defendant, without plaintiff's knowledge or consent, appropriated $7,000 thereof to the payment of the indebtedness owing by Chandler individually; that on the books of the new firm plaintiff was credited with the proceeds of the loan and by another entry of the same date Chandler was charged with the same amount; that plaintiff saw the entry by which he was credited, but did not see the one charging Chandler with the money, and if he had seen it he would not have understood it, as he was ignorant of bookkeeping; that plaintiff asked Chandler where the money was, and the latter told him it was in defendant's hands, subject to be drawn, and later told him that it had been absorbed in the business; that statements had been sent regularly to the firm by defendant, and there was no evidence that a credit of the money to the firm was shown; that plaintiff did not see the statements, he being about the store little, and depended upon Chandler to look after it; that an assignment for the benefit of creditors was made by the firm by which the assets and liabilities should have been shown. Plaintiff sued defendant for conversion of his money about six years after the alleged conversion. The court held the plaintiff failed to exercise proper diligence to discover the situation. Judge Williams, speaking for the court, said:

"Between the time of the conversion of the money and the institution of this action, six years elapsed. Nearly four years could be allowed plaintiff in which to discover a fraud, if one was perpetrated, before applying limitation, and still he is too late. If it were conceded that he sufficiently excuses his ignorance up to the time when the assignment was made, which we think cannot be done, still from that time more than two years and four months passed before the suit was filed. We are of the opinion that his cause of action for an affirmative recovery of the money converted, or for damages for the alleged fraud, is barred by limitation, and that the verdict and judgment cannot be sustained."

It should be stated most of the foregoing cases turned on the insufficiency of the evidence, as a matter of law, to show proper diligence on the part of the plaintiffs to discover the causes of action.

[3] A discussion of the evidence on this question is necessary. This evidence will be found in the testimony of the witness Charles J. Chaison. The record of Chaison's testimony is voluminous and contains numerous and unnecessary repetitions, making it difficult to reproduce in brief form. We shall endeavor to give enough to reflect fairly the substance of his testimony.

Charles J. Chaison is a son of Jef Chaison, deceased, and Clara Chaison. He was president and general manager of American Oil & Refining Company of Texas and of Texas Rice Land Company, and the Chaison estate owned most of the stock of both companies, owning 97 per cent. of the latter company. He was familiar with and managed all the affairs of both companies during their existence, and the witness managed all the interests of his mother and the other Chaison heirs under a power of attorney. The American Oil & Refining Company of Texas went into the hands of a receiver in 1908, J. D. Martin being the receiver, and remained in the hands of a receiver until some time in 1910, when its assets were sold by the receiver to the other company, the appellee.

The witness was familiar with the McFaddin, Wiess & Kyle Land Company, and knew that it was a partnership composed of W. P. H. McFaddin, V. Wiese, W. W. Kyle; McFaddin owning a half interest and the other two one-fourth interest each in the partnership. He said that V. Wiess died in 1913, his interest going to his widow and heirs, Laura E. Wiess, P. H. Wiess, and Mrs. Branham; that 1904 the partnership was dissolved and the McFaddin, Wiess & Kyle Land Company, the joint-stock association, was formed; that the McFaddin-Wiess Canal & Irrigation Company, a corporation, was the water company and built a canal across the Cunningham survey in 1902; that McFaddin's interest in the canal company was one-half and the interest of the other two was one-fourth each.

The witness said that when McFaddin took possession of the land in 1901 he told the witness that he individually had taken possession and for that reason the witness did not sue the partnership:

"We sued McFaddin instead of this partnership, McFaddin, Wiess & Kyle Land Company, on February 2, 1901, because I went to Mr. McFaddin and he told me that he had fenced the land himself individually and that he was going to keep it, and then he had this deed from the Hyde heirs. He had bought the land and was going to keep it. In February, 1901, McFaddin was representing and managing the Beaumont Pasture Company, the McFaddin, Wiess & Kyle Land Company, a partnership, McFaddin-Wiess Company, a partnership, and W. P. H. McFaddin, himself, individually, and McFaddin-Wiess Irrigation & Canal Company. I don't know any others. Now, with reference to this partnership properties in land and business that McFaddin was controlling, he had his own individual interests and properties lying right by the side of them and carried on substantially in the same place."

The witness had a conversation about the possession with Wesley Kyle, one of the mem-

bers of the partnership, in February, 1901, after the Chaisons had sued McFaddin:

"I had a conversation with Mr. Wesley Kyle; it was just soon after I filed this lawsuit in February, 1901. I met Mr. Kyle right at the railroad crossing. I had been to the courthouse, and he told me he wanted me to understand that he didn't have anything to do with that, and that was all Perry McFaddin's acts; he told me it was all Perry McFaddin."

The witness said that in the trial of the case of Clara Chaison v. McFaddin, in 1909, McFaddin testified that the McFaddin-Wiess Canal & Irrigation Company had leased a part of the Cunningham survey from the Gleises heirs, and that he had possession individually for his part until he lost it to the Hyde heirs and then V. Wiess bought it. The witness stated further that—

"Mr. Wiess as a party to that suit as intervener didn't do anything with reference to denying it."

The witness understood that V. Wiess had purchased the Hyde title in his own name, and by his intervention in the suit of Clara Chaison v. McFaddin claimed and recovered said interest in his own right, and the witness did not know that such interest was held in trust for the joint-stock association, the successor of the partnership, until November, 1913. The witness heard McFaddin testify in 1901 before a commissioner in the suit of the Hyde heirs in the federal court to cancel the deed:

"I heard him asked this question, 'You are not now claiming the entire survey adversely to the Chaisons?' I heard him make this answer. 'I am not claiming the Gleises' part of it.' This was when McFaddin was testifying in this case in 1901, I think. At that time I knew that McFaddin was not claiming the Gleises' part. He said he had had a division with the Gleises heirs in July—July 8, 1901. I heard him testify that he was not claiming the Gleises' part of it."

Referring to McFaddin's testimony in the suit of Clara Chaison v. McFaddin, the witness said:

"I heard McFaddin testify in 1909 that he did not claim the Gleises' half of the Cunningham survey. He said that he owned all of the survey for a while and held it until he had a division with the Gleises, until the Gleises sued him in 1901, and after that the canal company leased the land from the Gleises heirs. The written leases were introduced in evidence at that time."

The witness said that he learned for the first time that McFaddin, Wiess & Kyle Land Company, the partnership, was in possession in 1901, 1902, and 1903, when Henry Davidson testified to such fact in 1915 in the Langham receiver suit. The witness said that McFaddin in 1909, and again in 1912, in the suit of Clara Chaison v. McFaddin, testified that he had possession of half the land dur-

ing the period for which rents are herein claimed under the deed from the Hyde heirs (which was canceled in 1905), and of the other half for the canal and irrigation company under the Gleises leases, and that McFaddin introduced in evidence the said leases for the purpose of showing possession by said company. Being asked by his counsel why he had not sooner instituted suit against the partnership he said:

"I didn't know that they were withholding it. I didn't know that until 1915. All the evidence and everything else that I could get, and everything that I could possibly drag out with fighting and worrying, for 15 years, was that Perry McFaddin had one-half of it. That was the first time that I ever knew that the land company, as a partnership, or as a corporation, had it; but the first time that I ever knew that the land company, as a partnership, had it, was after the 1915 suit. Certainly, that is why I didn't file this suit sooner."

He said that he continued to believe up to 1915 that McFaddin was telling him the truth when he told him in 1901 that he had possession of the land, because everything that he saw and heard indicated that to be true. The witness, however, states that he lost confidence in McFaddin in 1901, when the latter refused to recognize the Chaisons as being jointly interested with him in the purchase from the Hyde heirs.

The witness said he knew in 1902, 1903 and 1904 that the Cunningham survey was planted in rice; that he knew Windsor and Reed, and that they were on the land; that a man by the name of Simms was there, but he did not know him; that he knew Windsor and Reed were actively farming the land and knew there were others out there besides them; that he never did inquire of them, except Windsor, who they were renting from, because he thought he knew; that he knew in 1903 that he had a lien on their rice crops for rent, but he did not try to subject the crops to the lien, because McFaddin had taken the land and the lawyers of witness were handling the matter.

The witness knew that Henry Davidson was farm foreman for McFaddin and his companies, but made no inquiry of Davidson. He further stated:

"It's a fact that the only conversation I had with Perry McFaddin was in 1901. I knew there were people on there in 1902, but I didn't know who it was. I thought they were Perry McFaddin's tenants."

"The only two inquiries I ever made were from McFaddin, when he took possession before they started to farm it at all, and Windsor, in 1904, as to who he was renting from. McFaddin was holding out to me in this court that he was the man. McFaddin didn't tell me anything, but he filed all those papers in here, and he swore to it and kept swearing to it."

The witness said that, on the trial of the case of Clara Chaison v. McFaddin in 1912,

he was asked and answered the following question:

"Q. Who has been the active agent and man who has kept you out? A. McFaddin has been the whole cheese, either for himself or McFaddin, Wiess & Kyle or the land company. There are so many of them I can't keep up with them, but every time he has been the whole works."

By this statement the witness said he meant just what he said; that McFaddin, either for himself or for McFaddin, Wiess & Kyle, or the land company, or the rice milling company, or the canal company, was the whole works, and that Wiess and Kyle never had anything to do with it; that when he said that he was the whole cheese in keeping him out, either for himself or for the land company, he meant it was under his direction; that he was the head man; that he was acting for himself or for one of those companies; "that is just what I said and what I mean."

"Q. And you mean he was acting for himself or one of those companies? A. One of those companies, Perry McFaddin was the whole cheese and the whole works down there for all of them. They were all so mixed up."

The witness further states:

"When Perry spoke of things he called everything down there 'mine.' I knew that all the time; it was his habit to call everything 'mine.'"

The witness stated that he did not know that McFaddin was holding any part of the land for the McFaddin-Wiess Canal & Irrigation Company until he testified in 1909 and introduced in evidence the Gleises' leases, of which the witness had no previous knowledge; that after this fact became known he and his attorneys continued to press the suit against McFaddin because it was their theory that McFaddin, being in possession and having committed the trespass, would still be liable personally, and the canal and irrigation company was not sued. Quoting from the witness:

"After the case of Chaison v. McFaddin was reversed after being tried in 1909, and we were in possession of the fact that McFaddin claimed the canal company had the land under leases from the Gleises' heirs, the reason why we didn't sue them was that we had a meeting and Mr. Ewing said that McFaddin was the whole thing down there and he was the man who was active in handling it all—handling all that business down there for everybody; McFaddin individually, V. Wiess individually, Mr. Kyle, the McFaddin, Wiess & Kyle Company, wherever they had any land, Perry McFaddin was in charge of it all; the land company, the partnership, the joint-stock association, all of them; that he was the one, and that his juggling the thing and jumping from one to the other and using it here to-day and there to-morrow would not relieve him, because he was the man who told me who put it in there, and he was the man who took charge, and he was the man that stayed there all the time, and he was the man

that was keeping me off all the time, and he was the original man, and there was no danger if we got a judgment against McFaddin we could keep it.

"Q. After that suit of 1909 and after the case was appealed and reversed, upon this consultation with Mr. Ewing and the other lawyers, did you then believe or think or know, either one, that McFaddin was juggling the possession and use of this land from one company to the other? A. We thought that Perry McFaddin was juggling this land, the Cunningham survey, from one company to the other. We thought that, if he did juggle it, it would make no difference. He couldn't juggle himself out of it. I thought he was juggling it from one company to the other and I think it yet."

"The reason why we did not sue them all and cut off every avenue of escape when we thought he was juggling it, the attorneys thought that their suit was in proper shape; they didn't think the court would let him out. They thought this—that Perry McFaddin was the man who took it and he was the active man for all those companies. There was no way of finding out who had it unless you went to Perry. He could put it in that company to-day and that one to-morrow and claim it himself the next day, and therefore he had all the means within his own hands, and they said a man sitting in that position, the law would not hold him guiltless for the acts he was doing."

"I saw those leases in 1909 for the Gleises' part of it, and I was put on notice then that the canal company withheld this land from me and used and cultivated it, and the court let Perry out of it so far as the rents were concerned."

"When I knew he was probably juggling it from the land company to the corporation and to himself, I never thought that he might be juggling in the name of a partnership too, because we had to think just as we saw it there, and that is all we could see. We tried, but that is all we could see. The partnership had never showed up in that case; that is why we didn't think about it as being one of the juggling parties."

"We knew there was a partnership between W. P. H. McFaddin, V. Wiess, and W. W. Kyle, known as the McFaddin, Wiess & Kyle Land Company, and we knew that Perry was managing that also. Well, you see, when Mr. Ewing said that Mr. McFaddin couldn't be let out—that was his theory—and they were the gentlemen who were handling it."

"Q. He didn't think that McFaddin could get out of it individually, even if he did juggle the partnership proposition too? A. He didn't think he would be let off that easy.

"Q. He thought that if Perry handled it for the partnership or the canal company or the rice milling company, or no matter how he handled it, or for whom he was acting, if he was juggling and he was the main cheese in the business, that he himself individually couldn't escape liability? A. We thought from the evidence that was there that McFaddin himself had taken possession of it, and he being the man that remained and stayed in possession of it and never did get out of possession, he was the man we ought to stick, and our reason for not suing the canal company was because Mc-

Faddin was the man that was in possession all the time; he was the active man in the canal company; the canal company was dead three years before. If the canal company was dead and dissolved, we knew the assets had gone into the McFaddin, Wiess & Kyle Land Company."

"We did not sue them; well, you see, we figured two years' limitation 'back then 'and thought we were cut off and it was a mixed-up proposition. We thought McFaddin was the man that was liable. They thought McFaddin was liable; he was the whole works. I never saw Kyle and Wiess down there in all my life. They had an interest in it, but I never saw them on the land in all my life. I say, if they put their foot on that land I never saw them. We didn't think it was necessary to go beyond Perry McFaddin, or even to make any inquiry beyond Perry McFaddin. We thought this way, that Perry McFaddin showed us who was in possession of it, and since he was the active man and we knew there was a lot of questions of two years' limitation going on, since he was the active man, we thought that we could stick him, and he was in his own right a very wealthy man and could pay this little judgment against him."

The witness stated that in 1905 he saw teams on the land with the harness on them marked MKW and knew the stock belonged to McFaddin, Wiess & Kyle, and supposed the MKW stood for McFaddin, Wiess & Kyle Land Company, which was the name of the partnership and also the joint-stock association, but he did not think that that put him on inquiry at all that it belonged to the partnership. The witness said:

"If those McFaddin, Wiess & Kyle Company horses and stock were down there any year previous to 1905, and I had taken the trouble to go down there, I would have found that out if I had hunted up the horses; but I found that land when I went down that way. People were on that land, and McFaddin was swearing that he was the man that was on it, and I never questioned him. At any rate, I didn't go down there. I don't know what I would have found out if I had taken the trouble to go down there."

The partition judgment between the Gleises and McFaddin and others rendered on July 8, 1901, referred to by the witness Chaison, set aside the 208-acre tract (containing 257 acres by actual survey) to W. P. H. McFaddin, V. Wiess, and W. W. Kyle, a 410-acre tract to W. P. H. McFaddin, and the balance of the survey to the Gleises.

While the evidence is lacking in strength, we cannot say it is wholly insufficient to support the finding in effect of the jury that the possession of the land was held in the name and under the ostensible claim of W. P. H. McFaddin, individually, and McFaddin-Wiess Canal & Irrigation Company, for the fraudulent purpose of concealing from appellee and its predecessors the fact of the partnership's possession and claim; hence said finding will not be disturbed. We cannot agree, however, that the evidence is sufficient to show proper diligence on the part of appellee and its predecessors to discover the partnership's claim and possession of the land during the period for which rents are claimed.

The appellee's suit was brought 15 years after the cause of action arose and 13 after the statute, on its face, had begun to run against the action. This fact alone, we believe, holds appellee to a strict rule of diligence. Indeed, the reported cases are few where a plaintiff has been able to present a sufficient excuse to justify a suspension of the statute for so great a space of time even where confidential relations existed. But every case rests upon its own facts, and we do not mean to say no case could be presented wherein the delay for such time, or even longer, would be excused. However, we do believe the facts would have to be peculiar and extraordinary to justify a court in suspending the statute for so long a time.

No relation of confidence and trust existed between McFaddin and Chaison. Neither owed the other any duty arising from such a relation. From the disagreement between them in 1901 down to the present time they have been avowed enemies, and have been in almost constant litigation with each other over the Cunningham survey. From that time this record discloses that each has battled for the undoing of the other. The situation has been filled with distrust and suspicion.

Beyond the statements made to Chaison by McFaddin and Kyle in 1901, and the statement to him by Windsor in 1904, and the fact that there was nothing of record showing the connection of Wiess and Kyle with the land, and the further circumstances that McFaddin's declarations in court up to 1909 and 1912 were that he held possession first for himself and then jointly for himself and the McFaddin-Wiess Canal & Irrigation Company, and the intervention of V. Wiess alleging that he had purchased and was the owner of the Hyde title, and the circumstance that 410 acres were set aside to McFaddin individually in the partition with the Gleises heirs in 1901, there is nothing that Chaison and his companies can offer as an excuse for their failure for 15 years to file suit against Wiess and Kyle, or the partnership, conceding, for the present, it could be sued.

On the other hand, the facts and circumstances are strong that no affirmative effort was made by them to get at the true situation, and that they were content with the suit against McFaddin alone, who they believed was liable under the law, regardless of others, and who they knew was a wealthy man and able to respond for the rents.

Chaison knew that Reed, Sims, and others were on the land as tenants, presumably, of somebody, but he made no inquiry of them. He knew Henry Davidson was farm foreman for McFaddin and his companies and in

charge on the ground, yet he made no inquiry of Davidson. He saw in 1905 that the harness on the ·mules on the land bore the initials MKW, which he said stood for McFaddin, Wiess & Kyle Land Company, whether partnership or joint-stock association, but made no inquiry as to who was then in possession or theretofore in possession, because he thought he already knew. He said he did not know what he would have found out if he had taken the trouble to go down to the land. He thought in 1903 that he had a statutory lien on the rice crops of Windsor, Reed, and Sims, but did not sue them to enforce the lien or to put them off. A suit against them would most likely have developed that they were in possession as tenants of the partnership, as was disclosed by the testimony of Davidson in 1915.

Chaison knew that McFaddin-Wiess Canal & Irrigation Company, a McFaddin company, put its canal across the land in 1902 in violation of the rights of the Chaisons, yet no action was taken against such company. But whatever may be said of the diligence used by appellee and its predecessors prior to the trial of the suit of Clara Chaison v. McFaddin in 1909, it is evident none was exercised thereafter.

[4] In 1909, and again in 1912, McFaddin testified in the last-named suit that his possession during the period for which rents are claimed was for himself under the Hyde title as to half and for the McFaddin-Wiess Canal & Irrigation Company as to the other half under leases from the Gleises, and the Chaisons, on this testimony, were denied a recovery for rents against McFaddin. After this Chaison was not justified in continuing to rely upon McFaddin's 1901 statement, shown to be untrue, that he individually was in possession, but Chaison continued to prosecute his suit against McFaddin alone, on the theory held by himself and his attorneys that McFaddin as the active wrongdoer would be liable, and thinking it unnecessary "to go beyond Perry McFaddin or even to make any inquiry beyond Perry McFaddin."

He had intimate knowledge of all the McFaddin companies, including the partnership, which McFaddin dominated, and knew that McFaddin had his individual properties lying by the side of the properties of his companies and that their business was "carried on substantially in the same place." He knew that McFaddin was the "whole works" down there for all of them; that "they were all so mixed up;" and that it was McFaddin's habit to call everything down there "mine." After the trial of 1909 Chaison thought that McFaddin was juggling the land from one company to another:

"We thought that, if he did juggle it, it would make no difference. He couldn't juggle himself out of it. I thought he was juggling it from one company to the other, and I think it yet."

It is true that Chaison says that he did not realize until 1915 that the juggling of McFaddin also extended to the partnership, but it is almost inconceivable that the suspicion of one of ordinary care and prudence, after all of the discussions that took place between Chaison and his attorneys after the trial in 1909, as to who should be sued, should not have been aroused toward the partnership as also involved in the "juggling" process. After the developments of 1909 ordinary prudence suggested that all of McFaddin's companies, including all members of the partnership, should have been sued, or brought into the Clara Chaison suit, in order to cut off every avenue of escape. None, however, was sued, because the attorneys thought "the suit was in proper shape," and since "there was a lot of questions of two years' limitation going on" and McFaddin was the active wrongdoer, it was thought that McFaddin could be held anyhow and, being a very wealthy man, could be made to pay the judgment.

[5] It is no answer to say that as further inquiry of McFaddin and the other partners, in whom reposed the best evidence of the partnership's connection with the land, would probably have developed nothing different from what Chaison had been told in 1901, or at least from what McFaddin had testified to in 1909, diligence would not require appellee to do anything further after the trial of the Clara Chaison suit; because we have here a relation between the parties, not of confidence and trust, but of open antagonism, suspicion, and lack of confidence, and appellee could not shut its eyes to the facts and circumstances that had been revealed and to reasonable inferences therefrom. It, or Chaison, then knew that either the information received from McFaddin in 1901, or the information revealed by the testimony of McFaddin in 1909, was untrue and that both could not be true. Chaison knew that McFaddin and his companies were "mixed up," and thought that the latter were "juggled" by McFaddin to suit his convenience and the exigencies of the lawsuit. Chaison and his attorneys then thought of and discussed the advisability of suing the McFaddin companies and thereby cutting off "every avenue of escape," but questions about "two years' limitation" arose, and it was decided such course was not necessary, as McFaddin could be made to respond, regardless of what connection the companies may have had with the matter. While Chaison says the partnership's probable connection with the matter was not discussed nor thought of, no reason is seen why a person of ordinary prudence should not have, under all the circumstances,

thought of the partnership and of the advisability of suing it and all of its members. We think ordinary care then required appellee, or its predecessors, to make the partnership and the other members, Kyle and Wiess, parties defendant with McFaddin.

Nothing, however, was done until this suit was brought six years later, after appellee had pursued its legal theory to an unsuccessful end against McFaddin, and after the fact of the possession by the partnership had become known, not as the result of any diligence on the part of appellee, but of testimony voluntarily tendered by McFaddin and Langham, receiver, in the 1915 suit.

The logical deduction from appellee's contention, it seems to us, is the position that it could rely blindly and for all time upon remote statements and conduct of McFaddin and the other partners, and that no diligence was required of it. We cannot agree to such position. Even if this were a case involving the relation of attorney and client, or some other confidential relation, such position would hardly be tenable, for in such a case lack of all diligence is not excused, as we have seen from the authorities mentioned.

There is no evidence that Chaison ever made inquiry of V. Wiess, one of the partners. Nor is there any evidence of any diligence on the part of the other Chaisons and the executors of Mrs. Russell to ascertain the connection of the partnership with the land. The Chaisons and the executors of Mrs. Russell were the original plaintiffs in the suit of Clara Chaison v. McFaddin. There is no evidence that J. D. Martin, receiver for two years of the American Oil & Refining Company of Texas, the immediate predecessor of appellee, exercised any diligence. And there is no evidence that said parties, except C. J. Chaison, did not have knowledge of such fact.

Counsel for appellee cite and rely upon Port Arthur Rice Mill Co. v. Beaumont Rice Mills, 105 Tex. 514, 143 S. W. 926, 148 S. W. 283, 150 S. W. 884, 152 S. W. 629. We do not think that case is in conflict with the decisions to which we have referred, nor with the views expressed herein. In that case the suit was filed November 22, 1907, and the fraudulent and concealed conversion, the cause of action declared upon, took place October 27, 1905. Thus the fraud was discovered and the suit filed within less than 30 days after the lapse of the two-year period of limitation, and the court expressly held that due diligence had been exercised by the plaintiff in ascertaining the facts and bringing the suit.

In the foregoing discussion we have assumed, as contended by appellee, that the partnership has a separate, suable status, and that there can be a cause of action against it distinct from the members that compose it, or, put in another form, a cause of action against the members as partners distinct from them as individuals; and, conceding the contention, it is our conclusion that the evidence is legally insufficient to show reasonable diligence on the part of appellee to discover its cause of action against the partnership or the members as partners. But we do not think the contention made by appellee as to the nature of its cause of action is sound. A discussion of our views on this subject will be necessary.

[6] It is well settled in Texas that a partnership is not a separate entity, apart from its members.

"The law recognizes no personality in a partnership other than that of the persons who compose it." Wiggins v. Blackshear, 86 Tex. 668, 26 S. W. 940; Frank v. Tatum, 87 Tex. 204, 25 S. W. 409; Glasscock v. Price, 92 Tex. 271, 47 S. W. 965; McManus v. Cash & Luckel, 101 Tex. 261, 108 S. W. 800; Martin v. Hemphill (Tex. Com. App.) 237 S. W. 550, 20 A. L. R. 984.

Having no legal existence, a partnership, as such, can neither sue nor be sued, nor can a judgment be rendered for or against it. Under articles 1863 and 2006, R. S., the property of the firm may be reached by suit against all partners and service upon at least one. Service upon one partner is sufficient under said articles to warrant judgment against the other partners as regards partnership assets, but the partnership is not thereby given a suable status. Construing these articles Judge Denman, in Glasscock v. Price, supra, says:

"They merely provide that when the partners are sued service upon one of them will authorize a judgment against the one served and against the firm, but that no personal judgment or execution shall be awarded against those not served. * * * Under these articles partners not served are before the court through service upon one partner, their agent as to partnership affairs, in so far as the court may render a judgment by which their interest in the firm property may be reached, * * * but not further. Thus it was held in Burnett v. Sullivan, 58 Tex. 537, that where both partners were sued as partners and only one was served, a judgment against the partner served and against both as partners, providing that execution could only issue against the partnership property and the individual property of the partner served, disposed of all the parties to the suit, though the case was not dismissed as to the partner not served."

Under the authorities to which we have referred, a dismissal of a partner, even though he has not been served, dismisses the partnership, and leaves the court without jurisdiction to render a judgment affecting the firm property. This is true because all partners must be sued in order to bind the firm property. But while such dismissal puts the partnership out of the suit, the

partner who has not been dismissed is left in the suit to answer individually.

It is not necessary for a judgment to dispose of the partnership in order to make it final. Judge Brown, in Frank v. Tatum, supra, says:

"If it were true that plaintiff sought in his petition to maintain his action against the firms as such, the failure to dismiss as to them would not prevent the judgment from being final, for the reason that the court could not enter judgment against such partnerships as such, and the setting up of their names as defendants would not present any issue upon which the court could act. No issue remained undisposed of, because no issue could be made with a thing that has no legal existence."

[7,8] It follows from the foregoing that a partnership cannot commit a trespass or tort. Townes on Torts, 123.

Judge Townes, in his able work on Torts, just mentioned, says:

"Thus a partnership is an association of persons who combine their capital, skill, or labor, or some of these, in a business enterprise for their joint profit; but a partnership, in legal contemplation, is not a person having rights and owing duties. The members own or have all the rights and owe all the duties. The business, though in the name of the firm, is really the business of the members of the firm. The property invested in the business is the property of the members and the debts of the concern are the debts of the members. The firm therefore can commit no tort. The tort by a member of the firm is, first, the tort of the person committing it. He is responsible, and as every member of the firm is the agent of all the other members within the real or even reasonably apparent scope of the partnership business, it follows that all the members of the firm are responsible for the torts of each member committed within the judgment of the firm's business. The same is true of agents of the firm not members of it. Their principals, viz. the members of the firm, are responsible for what their agents do within the scope of the agency. Hence we not infrequently see expressions in the text-books and opinions of the court which seem to hold the firm liable. These expressions are, however, against the weight of authority."

Appellee's action is for an unlawful trespass upon its land; McFaddin, as the active wrongdoer, being personally responsible, and the others likewise responsible because they must respond for the acts of their agent, McFaddin, committed within the scope of the partnership business, but all being jointly and severally liable as individuals.

Our conclusion is that appellee's cause of action is and must be against the individuals composing the firm and not the firm itself. This being true, the concealment alleged must relate to McFaddin, Wiess, and Kyle as individuals.

[9,10] McFaddin's connection with and trespass upon the land has been known to appellee and its predecessors from the beginning; hence this action is clearly barred as against him. Is the action barred as against Wiess and Kyle? We think so, under authority of Ware v. Galveston City Co., 111 U. S. 175, 4 Sup. Ct. 339, 28 L. Ed. 393, which holds:

"A statute of limitations that bars a claim against an agent, equally protects those on whose behalf he acted as agent, where there are no circumstances of equity to prevent the operation of the statute in their favor; the concealment of the fact of the agency where there is no fraud on the part of the principals, is insufficient for that purpose."

As to third parties, each partner is, by implication of law resulting from the partnership relation, the agent of every other partner with respect to concerns of the partnership. He acts as principal for himself and as agent for his partners. 20 R. C. L. 882, 883; Mechem's Elements of Part. § 164.

The trespass of McFaddin, if within the scope of the partnership, is imputed to Wiess and Kyle, who are bound by the acts of their agent, McFaddin. Under the doctrine of Ware v. Galveston City Co., supra, limitation having run in favor of the agent, McFaddin, it has also run in favor of Wiess and Kyle.

There is nothing in the record showing fraudulent conduct on the part of Wiess and Kyle. McFaddin has been a wealthy man from the beginning of the controversy and able to respond in damages. Hence we do not think there are any circumstances of equity in the case to prevent the operation of limitation in favor of Wiess and Kyle under the above-stated rule.

[11] Appellants make the contention that the judgment in favor of McFaddin in the case of Clara Chaison v. McFaddin, No. 2694, is res judicata of this suit, and estops the appellee from recovery herein, not only as against McFaddin, but as against the other appellants. We believe the contention is well taken.

In the suit of Clara Chaison v. McFaddin, No. 2694, the appellee here and its predecessors in interest claimed and sued for damages and rent against W. P. H. McFaddin for the years 1901, 1902, and 1903. The cause of action there alleged is identical with the cause of action set up here as between appellee and McFaddin. In that suit McFaddin was victorious; a judgment, after full trial, being entered in his favor and against the Texas Rice Land Company and its predecessors. In this case a recovery has been allowed against McFaddin for the identical trespass of which he was acquitted in the other suit. If the judgment herein stands, McFaddin will be made to pay rents for which he has been held not liable by the judgment in the other suit.

Appellee contends that res judicata does

not apply because, it says, this suit is a suit against the partnership and that the other suit was against McFaddin individually. Its counsel make the following statement in their brief:

"Plaintiff's cause of action, as disclosed by its petition, is based upon the wrongful acts of the partnership, McFaddin-Wiess & Kyle Land Company, for forcibly and wrongfully ousting plaintiff from the possession of the Cunningham survey and continuing to unlawfully and wrongfully hold possession of the same during the years 1901, 1902, and 1903, resulting in damages to plaintiff in the market tankage rental value of said land for said time, alleged to be $222,000. In the case of Clara Chaison et al. v. W. P. H. McFaddin, the plaintiff sued W. P. H. McFaddin for his individual wrongful act in tortiously excluding the plaintiff from the Cunningham survey and individually, forcibly, and fraudulently taking possession of the same and continuing in such wrongful possession, resulting in damages to the plaintiff in the sum of $50,000 for wrongfully taking and holding said possession, and $6 per acre for each year for rice culture."

But we have seen that a partnership has no separate suable status and that it cannot commit a trespass; hence a cause of action against it as such is an impossibility. We therefore think appellee is in error in assuming that there is one cause of action against the partnership and another against one or more of the individuals composing the partnership.

If our view is correct, Moore v. Snowball, 98 Tex. 16, 81 S. W. 5, 66 L. R. A. 745, 107 Am. St. Rep. 596, has no application. That case limits the doctrine of res judicata to the cause of action as made by the pleadings, holding that it has application only to the cause alleged, and not to other causes that might have been united in the same proceeding concerning the same subject-matter. But, as the partnership and the partners are inseparable, the case will not apply.

McFaddin's liability for the trespass was joint and several, and suit could be brought against him alone or against him and his partners jointly. McFaddin was sued alone in the Clara Chaison suit. The appellee has had its day in court as against McFaddin over the same subject-matter involved here, and we think it is clearly barred by the former judgment in McFaddin's behalf.

We now come to the position of Wiess and Kyle with reference to their pleas of estoppel on account of the former judgment in favor of McFaddin. The general rule is that, where the cause of action is founded upon a tort, a judgment without satisfaction against one of two trespassers is not a bar to another action against the other for the same trespass, and that a judgment adverse to the plaintiff in a suit against one of two joint tort-feasors is not a bar to a suit against the other. But there is a well-established exception to this rule where the immediate actor, or active wrongdoer, has been sued and a judgment has been rendered in his favor. In such case the plaintiff cannot recover against the other who has not participated in the trespass. This doctrine has particular application to such relations as principal and agent, employer and employee, master and servant, and where one of the parties is bound, not by any fault of his own, but derivatively through the act of another. Bigelow v. Old Dominion Co., 225 U. S. 128, 32 Sup. Ct. 641, 56 L. Ed. 1021, Ann. Cas. 1913E, 875; New Orleans & N. E. Ry. Co. v. Jopes, 142 U. S. 18, 12 Sup. Ct. 109, 35 L. Ed. 919; Emery v. Fowler, 39 Me. 326, 63 Am. Dec. 627; King v. Chase, 15 N. H. 9, 41 Am. Dec. 675; Lake Shore & M. S. Ry. v. Goldberg, 2 Ill. App. 228; Marks v Sullivan, 8 Utah, 406, 32 Pac, 668, 20 L. R. A. 590; Sonnentheil v. Moody (Tex. Civ. App.) 56 S. W. 1001; Portland Gold Mining Co. v. Stratton's Independence, 158 Fed. 63, 85 C. C. A. 393, 16 L. R. A. (N. S.) 677.

The exception is founded upon the obvious justice of denying a recovery against one for the acts of another when the latter has been held blameless. In this case McFaddin is shown to have been the immediate actor, and the liability of Wiess and Kyle rests upon his acts, committed within the scope of the partnership, or ratified by Wiess and Kyle. We think the case falls within the exception.

In the case of Portland Gold Mining Co. v. Stratton's Independence, a leading case decided by Justice Van Devanter when in the United States Circuit Court of Appeals, the plaintiff and Stratton's Independence owned adjoining mining properties. Stratton's Independence leased to one Burbridge a portion of its mine beneath the surface and adjoining the dividing line of the two properties. Burbridge arranged with one Price to take charge of the mining operations, and the trespass was by Price, who extended the operations beyond the line and to plaintiff's property. There was evidence showing that Stratton's Independence ratified the acts of Burbridge and Price. A verdict was instructed in favor of Burbridge and Price. The court held that, they having been exonerated, Stratton's Independence should also have been exonerated, saying:

"It is plain that the plaintiff's right, if any it had, to hold Stratton's Independence for a trespass was dependent, first, upon the commission of the trespass by those operating under the lease; and, second, upon its adoption or ratification of their act. They were the immediate actors, and, if guilty of a trespass, were personally responsible therefor, whether or not responsibility was also cast upon it. But, as it was not a participant in the mining operations, and, if responsible at all, became so only by adopting or ratifying their act, it follows

that no responsibility was cast upon it unless personal responsibility also attached to them."

In New Orleans & N. E. Ry. v. Jopes, supra, where it was sought to hold the railroad company for the act of its conductor in injuring a passenger, the conductor having been exonerated, the court said:

"It would seem on general principles that if the party who actually causes the injury is free from all civil and criminal liability therefor, his employer must also be entitled to a like immunity. * * * If the immediate actor is freed from responsibility, because his act was lawful, can his employer, one taking no direct part in the transaction, be held responsible? * * * The question carries its own answer. and it may be generally affirmed that if an act of an employee be lawful, and one which he is justified in doing, and which casts no personal responsibility upon him, no responsibility attaches to the employer therefor."

The only Texas case we have seen on the subject is Sonnenthiel v. Moody, 56 S. W. 1001, by the Austin Court of Civil Appeals, wherein persons charged with inducing an officer to make a wrongful seizure of property were sued for conversion; the plaintiff having theretofore sued the officer, who was exonerated. Judge Key, speaking for the court said:

"The former adjudication settles the question that such seizure was lawful, and did not invade any right of appellant; and therefore he cannot now be heard to complain that appellees commanded, persuaded, or induced the marshal to do that which he had the right to do."

In Clara Chaison v. McFaddin, appellee here sued McFaddin for rents based upon his trespass and was denied a recovery. . Whether that judgment, or the theory upon which it was based, was right or wrong, is immaterial. McFaddin having been exonerated from the payment of rents for the trespass, Wiess and Kyle should likewise be exonerated, and we so hold.

It will be unnecessary to discuss and pass upon other questions raised by the assignments.

The case should be reversed and rendered; and it is so ordered.

HIGHTOWER, C. J., disqualified and not sitting.